# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 25, 2010 Session

## STATE OF TENNESSEE v. INNOCENT S. NZAMUBEREKA

### Direct Appeal from the Criminal Court for Sullivan County
### No. S51,887    Robert H. Montgomery, Jr., Judge

### No. E2009-00755-CCA-R3-CD - Filed January 20, 2011

The Defendant-Appellant, Innocent S. Nzamubereka, was convicted by a Sullivan County Criminal Court jury in count one of domestic aggravated assault, a Class C felony, and in counts two and three of aggravated assault, a Class C felony. The trial court sentenced him to six years for each count and ordered counts one and two served concurrently with one another but consecutively to count three, for an effective sentence of twelve years. The court ordered Nzamubereka to serve six years in the Tennessee Department of Correction and allowed him to serve the remaining six years on probation. On appeal, Nzamubereka argues that (1) the trial court erred in finding that one of the victims was unavailable; (2) the evidence was insufficient to support his convictions; (3) the trial court erred in ruling on three evidentiary issues; (4) the trial court erred in allowing the State to make an improper comment during voir dire; and (5) the trial court erred in imposing an excessive sentence. Upon review, we affirm the trial court's judgments.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Ricky A.W. Curtis, Blountville, Tennessee, for the Defendant-Appellant, Innocent S. Nzamubereka.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; Kaylin Hortenstine and William B. Harper, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial.** Martina Carpenter testified that Nzamubereka was the father of her two daughters and that they were not living together in March of 2006. She saw Nzamubereka on March 11, 2006, at around 11:15 p.m. when she and her sister, Takila Carpenter,[1] dropped the children off at his home on Fairway Avenue in Sullivan County, Tennessee. Martina, Takila, and Martina's daughters walked up two flights of stairs to Nzamubereka's house and knocked on his door. When he did not answer, his daughters began knocking and yelling for their father. Nzamubereka finally opened the door, pulled the two children into his home, and closed the door without saying anything to Martina or Takila. Martina and Takila turned to leave. As they were walking down from the upper flight of steps to the lower flight of steps from the porch to the yard, Martina held Nzamubereka's dog so that Takila could walk down the lower flight of steps to the yard. Suddenly, Martina heard gunshots, and Takila yelled at her to get down. When Martina looked up at Nzamubereka, he was shooting at Takila. Martina said that Nzamubereka fired three shots at her before firing two or three shots at Takila. She also confirmed that neither she nor her sister Takila were armed that night. On cross-examination, Martina acknowledged that Nzamubereka was the primary custodian for their daughters. She also admitted that she "was not happy about the [custody] situation because of previous incidents[,] but . . . [w]e weren't really having a problem at [the] time [the shooting occurred]."

Takila Carpenter was declared unavailable pursuant to Tennessee Rule of Evidence 804(b)(1), and a tape of her testimony from the preliminary hearing was played to the jury at trial. Takila Carpenter testified similarly to her sister Martina regarding the incident. During the exchange of children, Takila told Nzamubereka, "[Y]ou don't have to make things so difficult all the time." As Takila and Martina were leaving Nzamubereka's home, Takila heard someone cock a gun. She turned around, saw Nzamubereka holding a black handgun on the porch, and then saw him fire the gun at Martina two or three times. Takila jumped the lower set of steps to the bottom. She then saw Nzamubereka aim the gun at her and pull the trigger. As she was struggling to get away, she heard two or three more shots. Takila checked to ensure that Martina was unhurt, and they both ran down the street, called 9-1-1, and stayed with a neighbor named Shasta Bledsoe until the police told Martina and Takila to go to a nearby gas station. Takila said that she had never met Bledsoe before the shooting occurred. On cross examination, Takila stated that neither she nor Martina had a gun that night and that she had never shot a gun.

Shasta Bledsoe testified that sometime during the late hours of March 11, 2006, and the early morning hours of March 12, 2006, she was at her boyfriend's house on Fairway

---

[1] Because Martina and Takila Carpenter share the same last name, we will occasionally refer to each of them by their first names for clarity purposes. We mean no disrespect in using their first names in this opinion.

Avenue. She went outside her boyfriend's home around midnight and saw Martina, Takila, and two young girls walk up the steps to Nzamubereka's house. She then saw Nzamubereka walk out onto the porch, curse at them, and force the children inside. As Martina and Takila were walking down the steps, Bledsoe saw Nzamubereka pull out a gun. She saw Martina jump down the steps as Nzamubereka shot at her. Then Takila jumped from the middle of the steps down to the road as Nzamubereka shot three times at her. Bledsoe said that she could see Nzamubereka clearly and observed him holding a black gun. When Nzamubereka realized that Bledsoe had seen him shooting at Martina and Takila, he cursed Bledsoe and shot at her three times as she was standing beside her car. After the shooting, Nzamubereka told Bledsoe that he was sorry for shooting at her. Bledsoe said that she did not know Nzamubereka, Martina Carpenter, or Takila Carpenter prior to the shooting. During cross-examination, Bledsoe said that she saw Nzamubereka leave his porch, walk down the steps, and begin "picking up stuff off of the ground" after Martina and Takila left to meet the police.

Sergeant Gary Keene, an officer with the Kingsport Police Department, testified that he was in the Lynn Garden community when he heard a gunshot fired around midnight on March 12, 2006. Approximately three to five minutes later, he received a call to respond to shots fired at Nzamubereka's home on Fairway Avenue, a short distance away. Upon his arrival, he spoke with Nzamubereka on the telephone and urged him to come out of his home so that officers would not have to go into the home and face him armed. Sergeant Keene stated that he did not leave the scene until 8:00 a.m. and that Nzamubereka never left his home voluntarily. On cross-examination, Sergeant Keene stated that he and other officers established a perimeter with officers in the front and back of Nzamubereka's house and that he never saw Nzamubereka walk outside his house once the perimeter was set.

Officer John Berry, a patrolman with the Kingsport Police Department and a member of the Special Weapons and Tactical (SWAT) team, testified that he was sent to Nzamubereka's house on Fairway Avenue at around 3:30 a.m. on March 12, 2006. Upon arriving, he and other members of his team established a perimeter and an emergency plan and made contact with Nzamubereka by telephone. He observed no activity inside or outside the house. Approximately three and a half hours after his team's arrival, the team learned via radio that Nzamubereka was at the back door of the house. The SWAT Team entered the house, and Nzamubereka ran into a bedroom and jumped into the bed with his two daughters. A white female was also found in the house. Nzamubereka was subsequently arrested. Officer Berry said Nzamubereka's home was very "clutter[ed]" He also said that Nzamubereka was "[a] little arrogant [and] loud" at the time of his arrest.

Detective Mark Mason of the Kingsport Police Department testified that on March 12, 2006, at approximately 1:00 a.m., he was called to investigate a shooting at 1040 Fairway

Avenue. He went to the Justice Center and took statements from the three victims, Martina Carpenter, Takila Carpenter, and Shasta Bledsoe. He said that he spent three or four hours with these women and described their demeanor as "[n]ervous, excited, scared, [and] upset." After taking the women's statements, he learned that Nzamubereka had been arrested. When Nzamubereka was brought to the jail, Officer Mason said that Nzamubereka was on "a tirade" and was "screaming, banging on the bars [and] climbing on the bars, continuously." Officer Mason then went to the scene of the shooting where he examined the outdoor area, took some photographs, and discovered two bullet holes in Nzamubereka's vehicle. Specifically, he observed an entry bullet hole on the top of the car and an exit bullet hole in the driver's side window. During direct examination, the following exchange occurred:

| [The State]: | Detective Mason, if you could I'm going to hand you a laser pointer[, and] I'd like [you] to take a look at what's been introduced as Exhibit No. 10. If you would tell the ladies and gentlemen of the jury what is shown in that photograph there? |
| --- | --- |
| [Detective Mason]: | This is an oblong bullet hole in the top of Mr. Nzamubereka's red [Volkswagon] Golf that was parked in front of his home. |
| [The State]: | And did you examine the hole in the top of the car? |
| [Detective Mason]: | I did, sir. |
| [The State]: | And were you able to tell anything about the nature of that hole by simply looking at it? |

The defense attorney requested a bench conference and stated, "If he's going to start asking him expert questions I'm going to object. There's been no foundation for that." The State responded by saying that it had just asked Detective Mason what he observed about the bullet hole. The court stated, "He can describe what his observations were[,] but I don't want him drawing any conclusions." The defense counsel interjected, "[M]y objection would be I don't think he can testify [regarding] which direction the bullet came [from] or anything else." The court stated its opinion that the direction from which the bullet came was obvious based on the photographs. The court then ruled:

[I]f you're going to get into that issue, talk about why something may be an entrance hole and something may be an exit hole and whether he's talking about the same bullet, and, you know, what direction did the bullet come from

-4-

then you might want to qualify him to talk about his training and experience in that area.

Following the bench conference, Detective Mason testified that he had been a detective for the last twenty years and had received training in fire arms and projectiles. He said that he had attended "a number of different schools on criminal investigations, advance criminal investigations[,] and death scene investigations." He added that he had worked on other cases where he had to determine the path that bullets traveled and had received training in that area. The State then showed Detective Mason a picture of the bullet hole in Nzamubereka's car and asked him, "based on [his] training and experience," if he could determine the area from which the bullet was fired. Detective Mason replied, "Judging from the entry hole and the exit hole and the elongated nature of the hole that was in [the] top of the vehicle it appeared to come from the area around the porch of 1040 Fairway."

Detective Mason said that he stood on Nzamubereka's porch and had a direct view of the top of Nzamubereka's vehicle. When the State showed him another photograph depicting the bullet's exit hole on the window of Nzamubereka's car, he said the hole in the window was "fresh because there [were] particles of glass going down the door and on the road underneath the door." Detective Mason opined that the two bullet holes were the result of the passage of a single bullet. When shown another photograph of the bullet hole on the roof of Nzamubereka's car, he stated, "[Y]ou can also tell the freshness of this damage in the fact that there is absolutely no oxidation whatsoever around or near the hole and these other pieces you see are flecks of fresh paint that c[a]me off the vehicle and they're surrounding the hole."

Detective Mason also stated that he searched for a gun while he was at the scene; however, he was unable to locate the weapon. He initially looked for the weapon outside but was unable to search very extensively because the area across the street from the house was covered in kudzu and the area behind the house was covered in vegetation that made the search very difficult. Once he obtained a search warrant, he searched the inside of Nzamubereka's home but was unable to do a thorough search because the house was so cluttered. Detective Mason said that he was unable to find any bullet casings at the scene. When he walked over to Bledsoe's car, he had a clear view to Nzamubereka's porch and front yard.

On cross-examination, Detective Mason stated that he did not conduct any type of gun shot residue test on Nzamubereka or Martina Carpenter. He also said there was no evidence that Nzamubereka left his home after the officers set up a perimeter around his house. Finally, he acknowledged that no gun or ammunition was found in or around Nzamubereka's home.

On re-direct examination, Detective Mason explained that he did not conduct any gunshot residue tests because he believed the tests were "wholly ineffective unless they're done almost immediately." He also said, "[I]t's my understanding that the TBI Crime Lab won't even perform the test anymore due to the fact that they're just, like I said, wholly unreliable." However, on re-cross examination, Detective Mason acknowledged that the bullet could have also been fired from Nzamubereka's yard.

Stacy McGill testified that she was Nzamubereka's ex-girlfriend, they had a son together, and she was present at Nzamubereka's home during the incident in this case. McGill stated that although Nzamubereka's children were supposed to be at his house at 8:00 p.m. on March 11, 2006, they did not arrive until 12:30 a.m. on March 12, 2006. Once the children arrived, Nzamubereka and the children went inside the house. When asked if there had been any problems with the custody situation, McGill replied, "Oh, definitely, there had been several problems." She stated that she did not have any knowledge of the presence of any guns at Nzamubereka's house. When defense counsel asked her if she heard any gunfire that night, she said, "At one point I heard a popping[,] but I really didn't think much about it because, you know, I guess it was just pop, pop, pop, pop, but it was muffled." She said that Nzamubereka was in his daughters' room when she heard the popping sound.

**Sentencing Hearing.** At the May 1, 2008 sentencing hearing, the State's only proof was the presentence investigation report and victim impact statements from Martina Carpenter, Takila Carpenter, and Shasta Bledsoe, which were entered into evidence. The presentence report showed that Nzamubereka, between the ages of twenty-one and twenty-three, received misdemeanor convictions for criminal trespass, contributing to the delinquency of a child, reckless driving, theft, perjury, vandalism, and resisting arrest as well as five convictions for reckless endangerment and three convictions for simple assault. Following his convictions in the instant case but prior to sentencing, Nzamubereka was also convicted of a traffic offense, a violation of the open container law, and driving under the influence of an intoxicant.

Nancy Lukach, Charlotte Ellis, Antwan Kay, Stacy McGill, Jennifer Pendleton, and Nzamubereka testified for the defense. Nancy Lukach, the court appointed special advocate for children who was assigned to the juvenile case involving Nzamubereka's daughters, testified that she investigated Nzamubereka's home and found it to be in an acceptable condition and found Nzamubereka's interaction with his daughters to be proper. She also stated that while primary custody went "back and forth" between Martina Carpenter and Nzamubereka, Nzamubereka obtained primary custody of his daughters for a period of time based on her recommendation that this change in custody was in the children's best interest. Lukach said that she did not have any concerns about Nzamubereka serving the remainder of his sentence in the community because he communicated with her in her role as a special

advocate, was cooperative with her during her investigation, and complied with all conditions of juvenile court. On cross examination, Lukach acknowledged that she and the juvenile court judge were aware of Nzamubereka's past criminal history including convictions for simple assault and resisting arrest. She also acknowledged that Nzamubereka acquired a new charge for disorderly conduct while she was working on his case. Despite this criminal history, Lukach said that the juvenile court judge still found that it was in the children's best interest for Nzamubereka to have primary custody based on his ability to care for them and ensure that they went to school. She also said that despite considering the three aggravated assault convictions that he received in the instant case, she would still recommend that Nzamubereka have primary custody. Although Nzamubereka did express a fear of law enforcement to her, he never showed any disrespect when dealing with law enforcement and judges in her presence.

Charlotte Ellis testified that Nzamubereka had done work for her and her husband on their home. She described him as "the best worker" that she and her husband had ever had and someone that she trusted at her home. She had absolutely no concerns about Nzamubereka moving into the community to serve the remainder of his sentence.

Antwan Kay testified that he was a good friend of Nzamubereka's father and had known Nzamubereka since Nzamubereka was four years old. He said that if the court allowed Nzamubereka to serve the remainder of his sentence in the community, he would be available to mentor him.

Stacy McGill and Jennifer Pendleton, mothers of Nzamubereka's children, testified that Nzamubereka was a excellent father who took an active role in raising their children. McGill and Pendleton both said that it would be in their children's best interest for Nzamubereka to be allowed to serve the remainder of his sentence in the community.

Nzamubereka testified in his own behalf and requested that the court grant him an alternative sentence because it would be in the best interest of his children. He said that he had commitments and responsibilities to his children that he could not fulfill if he were required to serve his sentence in incarceration. On cross-examination, Nzamubereka maintained his innocence.

At the conclusion of the sentencing hearing, the court sentenced Nzamubereka as a Range I, standard offender to six years for both of his convictions, with counts one and two to be served concurrently but consecutively to count three, for an effective sentence of twelve years. The court ordered that Nzamubereka serve six years of his sentence in the Tennessee Department of Correction and serve the remaining six years of his sentence on probation.

Nzamubereka subsequently filed a timely motion for new trial and an amended motion for new trial, which were denied by the trial court. He then filed a timely notice of appeal.

## ANALYSIS

**I. Unavailability of Victim.** Nzamubereka argues that the trial court erred in declaring Takila Carpenter unavailable pursuant to Tennessee Rule of Evidence 804 and erred in admitting Takila Carpenter's testimony from the preliminary hearing in this case. Specifically, he argues that there was no proof presented by the State that the witness was properly served with a subpoena and that the State had made good faith efforts prior to trial to locate and present Takila Carpenter. He also argues that the subpoena present in the court file, which was not included in the record on appeal, is "facially unusual" because the box on the return of the subpoena was not checked showing that the Sheriff's Department personally served Takila Carpenter. In addition, citing State v. Tommy Brown, Jr., No. W2006-02529-CCA-R3-CD, 2008 WL 141128, at *4 (Tenn. Crim. App., at Jackson, Jan. 11, 2008), he argues that Takila Carpenter was not unavailable because the State had direct access to Takila through her probation officer and indirect access to Takila through her sister, Martina Carpenter. Finally, without citing to authorities, Nzamubereka argues he is entitled to a new trial because the trial court's ruling on this issue violated his due process right to confront his accuser. In response, the State contends that the trial court properly found that Takila Carpenter was unavailable pursuant to Rule 804(a)(5) and properly admitted her testimony from the preliminary hearing pursuant to Rule 804(b)(1). The State also asserts, citing State v. Gomez, 163 S.W.3d 632, 642 (Tenn. 2005), that Nzamubereka's right to confrontation was not violated with the admission of Takila Carpenter's testimony from the preliminary hearing because the evidence was offered by an unavailable witness and because Nzamubereka had a prior opportunity for cross-examination. We agree with the State.

According to Rule 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Takila Carpenter's testimony from the preliminary hearing was obviously hearsay. See Tenn. R. Evid. 801(c). However, former testimony may be admissible at trial if the declarant is unavailable and "the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination." Tenn. R. Evid. 804(b)(1). One way that a witness may be deemed unavailable is if the witness "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process[.]" Tenn. R. Evid. 804(a)(5). This court established two requirements to ensure that a defendant's right of confrontation is not violated when dealing with former testimony:

[I]n cases . . . in which the prosecution seeks to offer the former testimony of an unavailable witness, the state must establish two prerequisites in order to satisfy the defendant's constitutional right of confrontation. First, the state must show that the declarant is truly unavailable after good faith efforts to obtain his presence, and second, that the evidence carries its own indicia of reliability.

State v. Summers, 159 S.W.3d 586, 597 (Tenn. Crim. App. 2004) (citations and footnotes omitted), perm. to appeal denied (Tenn. Jan. 18, 2005). The United States Supreme Court has held that the determination of the State's "good faith" efforts is "'a question of reasonableness.'" Ohio v. Roberts, 448 U.S. 56, 74 (1980) (quoting California v. Green, 399 U.S. 149, 189, n. 22 (1970) (Burger, J., concurring), overruled on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004)). The State bears the burden of proving that the witness is unavailable despite its good faith efforts to secure the witness's presence. Id. at 74-75. In State v. Brian Eric McGowen, this court also considered the second requirement that the evidence carry its own indicia of reliability:

[W]e note that our supreme court has determined that the former testimony exception to the hearsay rule is based upon such a solid foundation that it meets the indicia of reliability requirement. See State v. Causby, 706 S.W.2d 628, 631 (Tenn. 1986). In other words, "by definition the former testimony was given under oath, traditionally a strong indicia of truthfulness." Neil P. Cohen et al., TENNESSEE LAW OF EVIDENCE, § 8.34[2][a] (LEXIS publishing, 4th ed. 2000).

No. M2004-00109-CCA-R3-CD, 2005 WL 2008183, at *10 (Tenn. Crim. App., at Nashville, Aug. 18, 2005), perm. to appeal denied (Tenn. Dec. 27, 2005).

Here, the State filed a "Motion in Limine" to use Takila Carpenter's testimony from the preliminary hearing at trial on the basis that Takila was unavailable pursuant to Rule 804(a)(5) because she was subpoenaed to testify at trial but failed to appear. In a pre-trial hearing, the trial court noted that Takila Carpenter's subpoena in the court file showed that she was served on April 9, 2007 by the Sullivan County Sheriff's Office to appear at trial. The State explained that Nzamubereka was represented in the preliminary hearing by counsel, a different attorney than the one who represented him at trial, who conducted a cross-examination of Takila Carpenter. The State said that it believed Takila's testimony at trial would have been the same as her testimony at the preliminary hearing. Defense counsel argued that the use of Takila's testimony from the preliminary hearing would violate the confrontation clause of the United States and Tennessee Constitutions and would be unfairly prejudicial under Tennessee Rule of Evidence 403 because the jury would be unable to assess

her demeanor and because counsel would be unable to cross-examine her in front of the jury.

During the pre-trial hearing, Officer Bogle testified that he was asked the day of trial to locate an individual by the name of "Tomika Carpenter." He found the apartment at her listed address and spoke to a neighbor, who stated that someone named "Tina" lived in the apartment and that he was not aware of anyone by the name of Tomika at that address. Officer Bogle also stated that he left a message at the telephone number he had been given for Tomika Carpenter, although he had not yet received a response. On cross-examination, Officer Bogle acknowledged that he was not told that the individual that he was sent to find was actually named Takila Carpenter, not Tomika Carpenter, until after he had left the apartment complex.

Martina Carpenter testified that her sister, Takila Carpenter, was supposed to be living with her and had given Martina's address to her probation officer. She said that the last time she saw Takila was two days before trial. At that time, Martina reminded Takila of the need for her to appear and testify at trial, and Takila promised that she would be there. Martina stated that she had not received any phone calls to indicate that her sister had been arrested.

Tracy Arnold, Takila Carpenter's probation officer, testified that Takila told her that she was living with her sister, Martina Carpenter. Arnold said that the last time she had contact with Takila was September 6, approximately two weeks before trial, when she informed her that there had been a warrant issued for her arrest because of a probation violation. At the time of their conversation, Arnold was unaware that Takila had been subpoenaed to testify at this trial. Arnold had contact with Takila's employer on September 4, about three weeks before trial, and her employer said that Takila was still employed there.

The court found that based on the subpoena in the file, Takila Carpenter had been served with a subpoena to appear at Nzamubereka's trial. It also found that Martina Carpenter informed Takila of her need to be at trial, and the Sheriff's Department went to Takila's last known address but was unable to locate her. Finally, the court determined that the outstanding violation of probation warrant was likely a reason why Takila did not appear to testify. The court said that Takila's preliminary hearing testimony qualified as testimony given by the witness at another hearing of the same or different proceeding. Additionally, the court found that Nzamubereka, through counsel, "had the opportunity and similar motive to develop the testimony" at the preliminary hearing. The court ultimately granted the State's motion in limine and allowed Takila's testimony from the preliminary hearing to be admitted into evidence.

We conclude that the record supports the trial court's finding that Takila Carpenter was unavailable pursuant to Rule 804(b)(1). We also conclude that the trial court did not err

in allowing Takila's testimony from the preliminary hearing to be admitted at trial. First, the record shows that the trial court relied upon the subpoena in the court file, which showed that she had been served to appear at trial. Second, the court heard credible testimony from Officer Bogle, Martina Carpenter, and Tracy Arnold regarding the State's good faith efforts to have Takila Carpenter appear and testify at trial. We disagree with Nzamubereka's argument made pursuant to State v. Tommy Brown, Jr., 2008 WL 141128, at *4, that the State had direct access to Takila Carpenter through her probation officer and indirect access to her through her sister, Martina Carpenter. Unlike Tommy Brown, Jr., the record in this case makes it clear that the State did not know where Takila Carpenter was located and did not have indirect access to her through a family member. See id. In addition, the record in this case shows that the State did, in fact, have Takila Carpenter served with a subpoena. See id. Moreover, Nzamubereka has waived any arguments regarding the "facially unusual" subpoena in the court file because he failed to include a copy of this subpoena in the record on appeal. See Tenn. R. App. P. 24(b) ("[T]he appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."). Accordingly, Nzamubereka is not entitled to relief on this issue.

**II. Sufficiency of the Evidence.** Nzamubereka argues that the evidence is insufficient to support his convictions. First, he asserts that the discrepancies in the eyewitness testimony were "so inconsistent that no rational trier of fact could rely upon the same." Second, he claims that there was insufficient evidence that he fired the weapon since there was no gun found at his home, and there was no evidence that he left his residence after the shooting took place. He further argues that there was no ammunition found in his home and no shell casings were at the scene. Regarding count three, he argues that although Bledsoe claimed that he shot at her, neither Martina nor Takila Carpenter ever testified that they observed him shooting at Bledsoe.

In response, the State contends that because all three eyewitnesses, Martina Carpenter, Takila Carpenter, and Shasta Bledsoe, testified that Nzamubereka was the perpetrator in this case, there was more than sufficient evidence to support the convictions in this case. We agree.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from the evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of

Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt."

A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt; therefore, a defendant on appeal has the burden of showing that the evidence is insufficient to support the jury's verdict. State v. Thacker, 164 S.W.3d 208, 221 (Tenn. 2005) (citing State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)). A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in the State's favor. Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Issues regarding the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the jury as the trier of fact, and this court does not re-weigh or re-evaluate the evidence. Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)), perm. to appeal denied (Tenn. Nov. 13, 1990).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. As relevant here, "[t]he credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993), perm. to appeal denied (Tenn. Feb. 22, 1994)), perm. to appeal denied (Tenn. Dec. 27, 1999). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982), perm. to appeal denied (Tenn. June 21, 1982)). Furthermore, the jury may reject an alibi defense. Crawford, 635 S.W.2d at 705. "The defense of alibi presents an issue of fact determinable by the jury, as the exclusive judges of the credibility of the witnesses in support of the defense, and of the weight to be

given their testimony." Id. (citing Green v. State, 512 S.W.2d 641, 643 (Tenn. Crim. App. 1974), perm. to appeal denied (Tenn. May 20, 1974)).

All three eyewitnesses identified Nzamubereka as the perpetrator in this case. Although Nzamubereka argued at trial that either Martina or Takila Carpenter shot the gun the night of the incident because of animosity regarding the custody arrangement, this defense was rejected by the jury. The jury also rejected Nzamubereka's alibi that he was inside his home at the time that the shots were fired outside. Moreover, Shasta Bledsoe, a party unrelated and unknown to the Carpenter sisters prior to shooting, corroborated Martina and Takila's testimony regarding the incident. See Radley, 29 S.W.3d at 537 ("The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made."). Any minor inconsistencies in the eyewitnesses' testimony were resolved by the jury against Nzamubereka. Finally, the absence of a weapon, ammunition, or shell casings was explained by Detective Mason's and Bledsoe's testimony. As we previously stated, we will not "re-weigh or re-evaluate the evidence." See Bland, 958 S.W.2d at 659. Accordingly, Nzamubereka is not entitled to relief on this issue.

**III. Evidentiary Rulings.** Nzamubereka asserts that the trial court erred regarding three different evidentiary rulings. In response, the State contends Nzamubereka is not entitled to relief since the trial court did not abuse its discretion in making these rulings.

The Tennessee Supreme Court has generally held that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); and State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or [reaches] a decision which is illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

This court must apply the abuse of discretion standard when reviewing a trial court's decision regarding the relevancy of evidence under Rules 401 and 402. DuBose, 953 S.W.2d at 652. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Whether evidence is relevant is a decision left to the discretion of the trial court, and this court will not overturn a trial court's determination regarding relevancy without a showing that the trial court abused its discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

The Tennessee Supreme Court has held that the exclusion of evidence can violate a defendant's due process rights when it prevents a defendant from presenting a defense:

> Exclusions of evidence may violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. See Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000). In Washington v. Texas, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed 2d 1019 (1967) the United State Supreme Court stated:
>
> > The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.
>
> 388 U.S. at 19, 87 S. Ct. 1920.

State v. Flood, 219 S.W.3d 307, 315-16 (Tenn. 2007). The court further stated that the following factors should be considered when determining whether the exclusion of evidence results in a due process violation: "(1) [w]hether the excluded evidence is critical to the defense; (2) [w]hether the evidence bears sufficient indicia of reliability; and (3) [w]hether the interest supporting exclusion of the evidence is substantially important." Flood, 219 S.W.3d at 316 (citing Brown, 29 S.W.3d at 434-35; State v. Rice, 184 S.W.3d 646, 673 (Tenn. 2006); State v. Rogers, 188 S.W.3d 593, 614 (Tenn. 2006)).

-14-

**A. Ruling Excluding Prior Juvenile Court Proceedings and Kidnapping Charges.** Nzamubereka argues that the trial court prevented him from presenting a defense when it refused to allow him to present evidence showing the contested nature of the custody proceedings in juvenile court to establish Martina and Takila Carpenter's bias and motive. He also argues that the trial court erred in preventing him from introducing evidence that Martina Carpenter had accused him of kidnapping his children and that the criminal charges regarding the kidnapping were later dismissed. He claims that both of these pieces of evidence support his theory that Martina and Takila Carpenter "concocted" the events the day of the incident so Martina could regain custody of her children. Finally, Nzamubereka argues that the trial court failed to properly apply Rules 403 and 404(b) of the Tennessee Rules of Evidence.

In response, the State argues that the exclusion of any testimony regarding the kidnapping charges against Nzamubereka was proper on the basis that the evidence was irrelevant. In addition, the State contends that the defense failed to demonstrate how the evidence regarding the prior juvenile proceedings was relevant or would establish bias. We conclude that Nzamubereka has waived this issue.

Here, prior to trial, the State made a motion in limine[2] regarding the juvenile court custody proceedings between Nzamubereka and Martina Carpenter. Defense counsel argued that the defense "should be able to present evidence that there's been issues about the custody of these children going back and forth between the two parties, [and] that is the reason for bad [blood] between these parties." He added, "It's our position that Ms. Carpenter concocted this incident in an effort to get those children back . . . ." Defense counsel clarified that he did not seek to introduce any specific court orders regarding custody from juvenile court; instead, he wanted to ask Martina Carpenter about the ongoing custody problems and wanted to have Nzamubereka testify about the difficulties regarding custody, should he choose to testify. Defense counsel explained that the defense's position was that Martina or Takila Carpenter actually fired the shot and called the police the night of the incident. The defense claimed that this was buttressed by the fact that the police did not find a gun at Nzamubereka's home.

The court asked if there had been other criminal charges filed against either party regarding the custody problems. Defense counsel stated that Martina Carpenter alleged that Nzamubereka kidnapped his children, but these charges were later dismissed. Also, the State said that Nzamubereka had been convicted of domestic assault and theft of under $500 against Martina Carpenter. The State argued that court orders, court proceedings, or "bad

---

[2]Although the record makes it clear that the State filed a motion in limine, no such motion is in the record on appeal. However, the transcript from the hearing on the motion in limine is part of the record.

blood" between the parties was irrelevant under Rule 402 and would be highly prejudicial and confusing to the jury under Rule 403. However, the State said that it would acknowledge that they had shared parenting and that Martina Carpenter was returning the children to Nzamubereka the night of the incident. In response, defense counsel argued that the dismissed kidnapping charges showed "a pattern here of [Martina Carpenter's] trying to use law enforcement to regain custody of these kids" and that this evidence would provide a motive for Martina or Takila to fire the gun and tell the police that Nzamubereka shot at them. The Court found that evidence regarding previous accusations and allegations relating to custody was not relevant and could be confusing for the jury. The court continued:

> I don't see anything . . . wrong with [defense counsel] asking Ms. Carpenter if she's been unhappy or if she wants to gain custody, sole custody of the children, but as far as specific incidents . . . I just don't think that's appropriate. Now at some point in time it may later become appropriate, depending on the testimony, but on the front end I just don't see that in this case[.]

The court also stated that "the fact that a charge was brought and later dismissed in and of itself may . . . not be relevant to the issue of the witness's character for truthfulness or untruthfulness." Defense counsel asserted that he wanted to ask Martina Carpenter if she was happy with the custody situation, if she was angry that Nzamubereka had custody of the children, and if she wanted to get custody of the children back because these questions were relevant to her motive. The court asked the State if they were comfortable with the questions posed by defense counsel, and the State agreed to those specific questions. The court ruled, "I think you can ask those questions. Now, if we get much further along then we may have to have an out of jury hearing to let me make a determination."

During trial, defense counsel asked Martina Carpenter the following: "You were not happy with the custody situation with Mr. Nzamubereka[,] were you?" Martina replied, "At that time it really – there [weren't] a lot . . . of problems at that time. We weren't – no, I was not happy about the situation because of previous [incidents] but there wasn't really a problem. We weren't really having a problem at that time." As we previously mentioned, Takila Carpenter's testimony from the preliminary hearing was admitted at trial after she was found to be unavailable pursuant to Rule 804. At the preliminary hearing, Nzamubereka's attorney asked Takila if she or Martina had a gun on their person the night of the incident, and Takila responded that they did not. In addition, defense counsel asked her if she had ever shot a gun, and Takila replied, "No."

After reviewing the record, we conclude that although Nzamubereka was not allowed to introduce evidence regarding specific incidents related to the contested nature of the

custody arrangements, he was allowed to ask Martina Carpenter general questions regarding the custody situation. Here, the trial court determined that it would not allow defense counsel to ask questions regarding specific incidents between the parties relating to custody. Following this ruling, defense counsel stated that it wanted to ask Martina Carpenter whether she was happy with the custody situation, whether she was angry that Nzamubereka had custody of the children, and whether she wanted to get custody of the children because these questions were related to her motive to concoct the events in this case. The trial court ruled that these questions were acceptable. During Martina Carpenter's testimony, defense counsel limited his questions to those deemed acceptable by the trial court. However, defense counsel declined to make an offer of proof regarding the other questions relating to specific incidents of the contested custody arrangement and the responses of Martina Carpenter and Nzamubereka. Tennessee Rule of Evidence 103 provides:

> **(a) Effect of Erroneous Ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context; or
>
> (2) Offer of Proof. <u>In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.</u>
>
> Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

Tenn. R. Evid. 103(a) (emphasis added). Because Nzamubereka failed to make an offer of proof regarding this evidence, he was waived this issue. Moreover, we are unable to determine "[w]hether the evidence bears sufficient indicia of reliability" because of Nzamubereka's failure to make an offer of proof. See Flood, 219 S.W.3d at 316.

We also conclude that Nzamubereka failed to make an offer of proof regarding the particular pieces of evidence he sought to be introduced regarding the dismissal of the kidnapping charges, which again results in waiver pursuant to Tennessee Rule of Evidence 103(a). Similarly, we are also unable to determine "[w]hether the evidence bears sufficient indicia of reliability" because of Nzamubereka's failure to make an offer of proof. See id. Finally, we conclude that the trial court was not required to apply Rule 404(b) under these

-17-

facts and properly applied Rule 403 prior to making its ruling. Nzamubereka is not entitled to relief on this issue.

**B. Ruling Preventing the Defense from Asking Martina Carpenter If the Police Conducted a Gunshot Residue Test on Her Hands or If She Fired a Gun the Night of the Incident.** Nzamubereka contends that the trial court prevented him from presenting a defense when it refused to allow him to ask Martina Carpenter if the police conducted a gunshot residue test on her hands to determine if she fired a gun the night of the incident. He claims that these questions would have helped him establish his defense theory that the Carpenter sisters "concocted" the incident at issue in this case in an attempt to have Martina Carpenter regain custody of her children. He contends that he was effectively prevented from presenting a defense because the court prevented him from asking these questions to Martina Carpenter. In response, the State argues that because the trial court properly determined that there was no factual basis for the questions and that Martina Carpenter was not the proper witness to ask about the police investigation, Nzamubereka is not entitled to relief on this issue. We agree with the State.

Here, defense counsel on cross-examination asked Martina if she had ever fired a gun. She responded, "No." He then asked her, "Did the police do any type of gun shot residue analysis on your hands?" The State immediately objected, and the court called a bench conference and then a jury-out hearing to deal with the issue. The court stated, "I don't know that you just get to lob something out there unless you have a good faith basis." Defense counsel responded, "I'm just asking about the investigation. [There are] three people there. The State's going to introduce evidence that there is a shot that hit a car. My client says he didn't fire the shot, so [there are] only three people there that night, that's my basis." The court sustained the State's objection on the basis that Martina Carpenter was not the proper witness to ask about the gun shot residue test and that defense counsel could ask Detective Mason if he tested anyone's hands for gunshot residue. When Detective Mason was cross-examined by defense counsel, he testified that he did not perform a gunshot residue test on Martina or Takila Carpenter. On re-direct examination, he opined that that gunshot residue tests were ineffective unless done immediately and that it was his understanding that the TBI would not perform these tests anymore because of their unreliability.

After reviewing the record, we conclude that Nzamubereka was not prevented from presenting a defense on this issue because he was allowed to ask Detective Mason about whether he performed gunshot residue tests on Martina and Takila Carpenter. Consequently, Martina's response to defense counsel's question regarding the gunshot residue test was not "critical to the defense[.]" See Flood, 219 S.W.3d at 316. Moreover, he was allowed to ask Martina if she had ever fired a gun and if she or Takila were armed the night of the incident. Nzamubereka is not entitled to relief on this issue.

-18-

**C. Ruling Allowing Detective Mason to Testify Regarding Bullet Holes.**

Nzamubereka argues that he is entitled to a new trial because the trial court erred in allowing Detective Mason to testify as an expert regarding the bullet holes in Nzamubereka's car, despite the fact that Detective Mason was not qualified as an expert. He specifically argues that Detective Mason used "scientific, technical, or other specialized knowledge" pursuant to Tennessee Rule of Evidence 702 in giving his expert opinion regarding the entrance and exit holes made by the bullet, the direction from which the gun was fired, and his opinions regarding the age of the bullet holes based on the lack of oxidation. In response, the State contends that Detective Mason's testimony satisfied the two requirements of lay witness testimony in Tennessee Rule of Evidence 701 and that the trial court never accepted Detective Mason's testimony as expert testimony. Because Nzamubereka has waived this issue, he is not entitled to relief.

Unless witnesses are qualified as experts, they may only offer opinions or inferences which are "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). However, Rule 702, which governs the admissibility of expert testimony, states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702.

Here, the State asked Detective Mason if he was able to tell anything about the bullet holes in Nzamubereka's car. Defense counsel requested a bench conference and stated, "If he's going to start asking him expert questions I'm going to object. There's been no foundation for that." The court determined that if Detective Mason was going to get into issues regarding whether something is an entrance or exit bullet hole, whether the holes were caused by the same bullet, or from what direction the bullet traveled, then the State "might want to qualify him to talk about his training and experience in that area." Following this bench conference, Detective Mason testified that he had been a detective for the last twenty years, had attended numerous schools on advanced criminal investigations and death scene investigations, had received training in determining the path of bullets, and had used this training in cases in the past. The State then presented Detective Mason with pictures of the two bullet holes in Nzamubereka's car and asked him if he could determine the area from which the bullet was fired. He responded that he believed the bullet came from the porch of Nzamubereka's home. However, on cross-examination, Detective Mason acknowledged that the bullet could have also been fired from Nzamubereka's yard.

The State arguably qualified Detective Mason as an expert when he testified about the area from which the bullet was fired. Detective Mason's testimony was based on the type

of "scientific, technical, or other specialized knowledge" contemplated by Rule 702. See State v. Mark Anthony Foulk, No. E2007-00944-CCA-R3-CD, 2009 WL 47346, at *13 (Tenn. Crim. App., at Jan. 8, 2009) (concluding that detective's testimony regarding a wound to the defendant's face was expert testimony in the area of gunpowder stippling despite the fact that the State never qualified him as an expert), perm. to appeal denied (Tenn. May 26, 2009). Moreover, the State asked him to give his opinion based on his training and experience. See id. Although defense counsel initially called a bench conference and said that he was "going to object" if the State started asking the witness expert questions without laying the proper foundation, defense counsel never actually objected when Detective Mason gave his opinion about the location where the bullet was fired. Therefore, the issue is waived. See Tenn. R. App. P. 36(a) (Relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."). Nzamubereka is not entitled to relief on this issue on appeal.

**IV. State's Comments During Voir Dire.** Nzamubereka argues that the trial court erred in allowing the State to mention O.J. Simpson during voir dire. He specifically asserts that "any time a black defendant is on trial, any reference to O.J. Simpson's legal troubles constitutes error, in that a juror could infer (even without any intended implication whatsoever) that the reference was meant to demonstrate that before them sits another black defendant trying to get away with murder." In response, the State contends that Nzamubereka has waived this issue because he failed to object to this comment during voir dire. It also argues this issue is waived because he failed to cite any authority to support this argument in his brief. We agree with the State.

Here, during voir dire, the prosecutor made the following statement:

Will each of you agree to follow the law that [the trial judge] gives you in this case? Will each of you do that? And the reason I ask you that is, it seems like in today's society we are bombarded with different interpretations of what the law is. Thank[s] to OJ Simpson we can now look forward to learning about Las Vegas law for the next five or six months. Will each of you agree to do that, to follow the law that [the trial judge] gives you and not what you may have heard on TV last night or perhaps read in a book? Can each of you do that?

We agree with the State that Nzamubereka has waived this issue by failing to make a contemporaneous objection to the prosecutor's remark at trial. See Tenn. R. App. P. 36(a); State v. McPherson, 882 S.W.2d 365, 373 (Tenn. Crim. App. 1994), perm. to appeal denied (Tenn. June 20, 1994); State v. Gregory, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993); and

State v. Thomas, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991), perm. to appeal denied (Tenn. Sept. 9, 1991). We also agree with the State that Nzamubereka has also waived this issue by failing to cite any authority. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See Tenn. Ct. Crim. App. R. 10(b). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. Id.; State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987), perm. to appeal denied (Tenn. Sept. 8, 1987). Accordingly, Nzamubereka is not entitled to relief on this issue.

**V. Sentencing.** Nzamubereka contends that the trial court erred in imposing the maximum sentence for each of his convictions, erred in ordering a partially consecutive alignment of sentences, and erred in denying alternative sentencing. In response, the State argues that the record supports the sentence imposed in this case.

This case is governed by the 2005 amended sentencing act because these offenses occurred on March 12, 2006. Under the amended sentencing act, "the trial court 'shall consider, but is not bound by' an 'advisory sentencing guideline' that suggests an adjustment to the defendant's sentence upon the presence or absence of mitigating and enhancement factors." State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2008) (quoting T.C.A. § 40-35-210(c) (2006)). Moreover, under the new law "[a]n appellate court is . . . bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346. The Tennessee Supreme Court explained the impact of the 2005 amended sentencing act:

> The amended statute no longer imposes a presumptive sentence. Rather, the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." Id. § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," id. § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," id. § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," id. § 40-35-103(5).

Carter, 254 S.W.3d at 343 (internal footnote omitted). The court also emphasized the broad discretion the trial court has in sentencing a defendant under this act:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has

-21-

been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

Id. at 345-46.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court may not disturb the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In a case where "the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails." Carter, 254 S.W.3d at 345 (citing State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992), perm. to appeal denied (Tenn. March 22, 1993)). Because it appears that the trial court properly considered the purposes and principles of the sentencing act, our review is de novo with a presumption of correctness. See id. at 345-46; Ashby, 823 S.W.2d at 169.

A trial court, when sentencing a defendant, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006); see also State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002); State v. Osborne, 251 S.W.3d 1, 24 (Tenn. Crim. App. 2007), perm. to appeal denied (Tenn. Jan. 28, 2008). The defendant has the burden of showing the impropriety of the sentence. See T.C.A. § 40-35-401(d) (2006), Sentencing Comm'n Comments.

**A. Length.** Nzamubereka argues that the trial court erroneously applied enhancement factors (8) and (10) in this case. Specifically, he claims that the court erred in applying factor (8) because he was no longer on unsupervised probation when he committed the April 16, 2001 offenses. He also argues that the court's application of factor (8), as to his November 18, 2000 reckless endangerment offense, should be given little weight because he committed that offense while he was on unsupervised probation. Finally, he argues that the trial court inappropriately applied factor (10) on the basis that he did not exit his home for the SWAT team. In response, the State concedes that the trial court erroneously found that he committed a theft and an assault on April 16, 2001 while on unsupervised probation as one of the justifications for the application of factor (8); however, the State argues that the court correctly applied factor (8) to Nzamubereka's November 18, 2000 reckless endangerment offense that he committed while he was on unsupervised probation. The State further argues that the amended sentencing act allows the trial court greater discretion in sentencing and that the trial court's imposition of a six-year sentence for each of the convictions was justified. We agree with the State.

The trial court determined that Nzamubereka was a Range I, standard offender. The court also applied the following enhancement factors in this case:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

. . . .

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; [and]

. . . .

(10) The defendant had no hesitation about committing a crime when the risk to human life was high[.]

T.C.A. § 40-35-114(1), (8), and (10) (2006). The court did not apply any statutory mitigation factors in Tennessee Code Annotated section 40-35-113. Regarding his work history, the court said, "I'm not going to find that as a mitigator, though I do give you some credit for having a work history[.]"

The court properly applied enhancement factor (1) because Nzamubereka had a criminal history that included misdemeanor convictions for criminal trespass, contributing to the delinquency of a child, reckless driving, theft, perjury, vandalism, and resisting arrest as well as five convictions for reckless endangerment and three convictions for simple assault. In addition, following his convictions in the instant case but prior to sentencing, Nzamubereka was also convicted of a traffic offense, a violation of the open container law, and driving under the influence of an intoxicant.

We also agree that the trial court erroneously found that Nzamubereka committed a theft and an assault on April 16, 2001 while on unsupervised probation as one of the justifications for the application of enhancement factor (8). However, we also agree with the State that the court correctly applied factor (8) to Nzamubereka's November 18, 2000 reckless endangerment offense that was committed while he was on unsupervised probation. Therefore, the court properly applied factor (8) as to the reckless endangerment offense.

Nzamubereka also argues that the trial court erred in applying enhancement factor (10). Here, the trial court gave the following explanation for its application of factor (10) in this case:

I'm going to [apply factor (10)] but not [f]or the reason the State suggested. The State suggested that it was [applicable] because of the circumstance, but it you look at the fact that while the criminal charge involves the shooting of a weapon in a relatively brief time period, you have to add . . . the other six or seven hours that are involved . . . when law enforcement was surrounding the house, when there were young children inside the house, when there was another woman inside the house. In my opinion that should be considered as part of this criminal episode and while he wasn't charged with not coming out of the house when he was instructed to do that, at the same time in my opinion by going in, by not responding, by not doing what the officers asked him to do, in my opinion he was creating a risk, there was a high risk to human life because of his actions as part of this entire incident. I'm not talking about the shooting part[,] but I'm talking about when you consider . . . his remaining in

-24-

the house with those young children and with the other woman with law enforcement surrounding [his house], asking him to come out and his not coming out so I do find [this factor] because of that fact.

The Tennessee Supreme Court has evaluated the application of factor (10) when individuals other than the victim are endangered by the defendant's conduct:

The enhancement factor in Tenn. Code Ann. § 40-35-114(10) is broadly written to include "risk to human life," and it does not contain the restrictions to "the crime" and "a victim" that are contained in Tenn. Code Ann. § 40-35-114(16). Indeed, in the present case it is the "risk to human life" factor that accounts for the fact that other individuals were involved in the accident and endangered by the defendant's actions.

State v. Imfield, 70 S.W.3d 698, 707 (Tenn. 2002). In light of the danger he created for his children, his girlfriend, and the SWAT team and officers present at his home the night of the incident, we conclude that the trial court properly applied factor (10).

Under the amended sentencing act, as relevant in this case, "the trial court 'shall consider, but is not bound by' an 'advisory sentencing guideline' that suggests an adjustment to the defendant's sentence upon the presence or absence of mitigating and enhancement factors." Carter, 254 S.W.3d at 344. We conclude that the court's application of factors (1), (8), and (10) was more than sufficient to enhance Nzamubereka's sentence to the maximum sentence in the range for each conviction.

**B. Consecutive Sentencing.** Nzamubereka also contends that the trial court erred in ordering a partially consecutive sentence alignment. First, he claims that he does not have an extensive criminal history because he was convicted only of five misdemeanors between the ages of twenty-one and twenty-three and received no convictions in the five years preceding this case. Second, he challenges the court's finding that he was a dangerous offender but fails to make any argument in support of this contention. In response, the State argues that the trial court properly determined that Nzamubereka was an offender whose record was extensive and that he was a dangerous offender. See T.C.A. § 40-35-115(b)(2), (4) (2006). We agree with the State.

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a) (2006). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b) (2006). An order of consecutive sentencing must be

-25-

"justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1) (2006). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2) (2006).

Here, the trial court imposed consecutive sentencing because it determined that Nzamubereka was "an offender whose record of criminal activity [was] extensive" and was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b) (2), (4) (2006). This court has held that "[e]xtensive criminal history alone will support consecutive sentencing." State v. Adams, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997) (citing State v. Chrisman, 885 S.W.2d 834, 839 (Tenn. Crim. App. 1994), perm. to appeal denied (Tenn. Sept. 12, 1994)), perm. to appeal denied (Tenn. March 2, 1998). Here, the presentence report showed that Nzamubereka, between the ages of twenty-one and twenty-three, received misdemeanor convictions for criminal trespass, contributing to the delinquency of a child, reckless driving, theft, perjury, vandalism, and resisting arrest as well as five convictions for reckless endangerment and three convictions for simple assault.

Initially, we conclude that Nzamubereka has waived any challenge to the court's determination that he was a dangerous offender because he failed to present any argument on this issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). We further conclude that the trial court did not err in requiring Nzamubereka to serve counts one and two consecutively to count three. A finding of any one of the factors in section 40-35-115(b) can justify the trial court's imposition of consecutive sentencing. The record on review shows that the trial court properly found that Nzamubereka was both an offender "whose record of criminal activity [was] extensive" and "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b) (2), (4) (2006). At the sentencing hearing, the trial court reviewed Nzamubereka's criminal history, which was not disputed by him. Accordingly, Nzamubereka is not entitled to relief on this issue.

**C. Alternative Sentence.** Nzamubereka further argues that the trial court erred in denying alternative sentencing on the basis of his "long history" of criminal conduct. He also contends that there was only one instance, rather than two, where he committed a misdemeanor while on unsupervised probation. Finally, he argues that the trial court improperly denied alternative sentencing based on the fact that his children were born out of wedlock, especially given the testimony at the sentencing hearing from two of the three mothers of his children. In response, the State asserts that under the amended sentencing act, a defendant is not presumed a favorable candidate for alternative sentencing. See T.C.A. §

40-35-102(5), (6) (2006). The State also notes that the trial court found that that Nzamubereka was not eligible for community corrections because there was no evidence that he had special needs and because he had a prior history of violent behavior. We agree with the State.

Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Tennessee Code Annotated section 40-35-102(6) (2006) states that a defendant who does not require confinement under subsection (5) and "who is an especially mitigated or standard offender convicted of a Class C, D, or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.]" A trial court should consider the following when determining whether there is "evidence to the contrary" that would prevent an individual from receiving alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2006); see also Ashby, 823 S.W.2d at 169.

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996), perm. to appeal denied (Tenn. Oct. 14, 1996). Where a defendant is considered a favorable candidate for alternative sentencing, the State has the burden of presenting evidence to the contrary. See State v. Bingham, 910 S.W.2d 448, 454 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000), perm. to appeal denied (Tenn. Oct. 2, 1995). However, the defendant has the burden of establishing suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. See id. (citing T.C.A. § 40-35-303(b)).

A defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. T.C.A. § 40-35-303(a) (2006). The trial court shall

-27-

automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. Id. § 40-35-303(b) (2006). In addition, "the defendant is not automatically entitled to probation as a matter of law." Id. § 40-35-303(b) (2006), Sentencing Comm'n Comments. Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. See State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002), perm. to appeal denied (Tenn. Mar. 17, 2003).

When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, his present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public. See State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999) (citing State v. Grear, 568 S.W.2d 285 (Tenn. 1978)). The court should also consider the potential for rehabilitation or treatment of the defendant in determining the appropriate sentence. See T.C.A. § 40-35-103(5) (2006). In addition, the principles of sentencing require the sentence to be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2006). Moreover, the Tennessee Supreme Court has held that truthfulness is a factor which the court may consider in deciding whether to grant or deny probation. State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983) (citing State v. Poe, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981), perm. to appeal denied (Tenn. Mar. 23, 1981)).

Here, the trial court found that "[c]onfinement [was] necessary to protect society by restraining a defendant who has a long history of criminal conduct[,]" and "[m]easures less restrictive than confinement [had] frequently or recently been applied unsuccessfully to the defendant[.]" T.C.A. § 40-35-103(1)(A)-(C) (2006). In applying the first factor, the trial court stated that it was relying on the same findings it made when considering consecutive sentencing. Regarding the second factor, the court noted that Nzamubereka had previously received split sentences, full probation, and had committed crimes while he was on probation. The court found that Nzamubereka had a poor social history because he had fathered so many children out of wedlock. Then the trial court made the following findings regarding Nzamubereka's potential for rehabilitation:

> The other thing I have to look at, too, is what your potential for rehabilitation is and frankly of course . . . you deny any of this happened other than the fact that you had . . . too much to drink and when you went inside the house and all these law enforcement people showed up you didn't come out. I mean that's basically what you're saying happened that night and of course the jury has found otherwise. I found otherwise based on the testimony here

today. In order for someone to succeed at rehabilitation then they need to have an awareness of what they did wrong and if you don't appreciate the wrongfulness of your actions then that in turn – because you obviously can't take responsibility for your actions in this case, then I don't find you to be truthful and I think that that would in turn mean that you would have a poor ability to do well if I placed you on [full] probation.

The court also stated that Nzamubereka was not eligible for community corrections because he did not have special needs and because of his "prior history of violent or assaultive behavior." Ultimately, the trial court imposed a twelve-year sentence, with Nzamubereka to serve six years in the Tennessee Department of Correction before serving the remaining six years on probation.

Upon review, we conclude that the trial court's sentence was proper. Nzamubereka has failed to show the impropriety of his sentence. Accordingly, he is not entitled to relief on this issue.

## CONCLUSION

Upon review of the record, we affirm the trial court's judgments.

_____
CAMILLE R. McMULLEN, JUDGE