STATE of Tennessee

v.

Timothy FLOOD.

Supreme Court of Tennessee,
at Knoxville.

Jan. 3, 2007 Session.

March 15, 2007.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellant, State of Tennessee.

Leslie M. Jeffress, Knoxville, Tennessee, for the appellee, Timothy Flood.

## OPINION

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., joined.

The defendant was convicted of four counts of rape of a child in violation of Tennessee Code Annotated section 39–13–522. At the trial, the defendant attempted to present testimony from the victim's father about statements made by the victim. The victim had made two statements to her father that the defendant argued rebutted the victim's testimony and suggest-

ed that a third party had committed the crimes. The trial court excluded the evidence because the testimony was hearsay and because the defendant had failed to question the victim about the statements during cross-examination. The Court of Criminal Appeals held that while the trial court properly applied the rules of evidence, the evidence was improperly excluded because the exclusion denied the defendant his right to present a defense. We hold that the trial court correctly excluded both statements as inadmissible extrinsic evidence of prior inconsistent statements even though one of the statements was non-hearsay. We also hold that the trial court's exclusion of the evidence in this case does not rise to the level of a constitutional violation because the excluded evidence was not critical to the defense. The judgment of the Court of Criminal Appeals is reversed.

### I. Facts and Procedural History

On December 16, 1999, the Knox County Grand Jury returned a presentment charging the defendant, Timothy Flood ("Flood"), who was then twenty years old, with four counts of rape of a child in violation of Tennessee Code Annotated section 39–13–522. The charges were based on four separate incidents between May 1999, and July 1999, when Flood is alleged to have placed his penis in the mouth of the victim, who was eight years old. The incidents all occurred at Deborah Flood's house, where Flood lived. Deborah Flood is Flood's mother and the victim's aunt.

At trial, the State's case-in-chief consisted of the testimony of the victim and two investigators, one from the Department of

Children's Services ("DCS") and the other from the Knoxville Police Department. The victim, who was thirteen years old at the time of trial,[1] testified that the first incident occurred at the end of the school year in May 1999, when the she was in the third grade. The victim was visiting Deborah Flood's house when Flood flew the kite she had just purchased into a tree. Flood asked the victim if she would come to his bedroom so that he could pay her for the kite. When they were in his room, Flood asked the victim if she would do him a favor to get the money: "[H]e asked me, 'Will I suck his private part?' And I was like—glanced at him like—then I was like, 'yeah,' cause I—because I wanted a kite. So I really didn't know what that was then. So I did it."

The second incident also occurred at the end of the school year in 1999. The victim and Flood were sitting in the den of Deborah Flood's home with no one else around. The victim testified that after Flood asked, she "sucked his penis."

The third incident occurred when the victim was in Flood's bedroom to help him fix his stereo speakers:

[H]e said, "Yeah, do me a favor." So—I said, "Okay" and I did—and I said, "What?" He said, "You got to do it, or you can't fix my speakers, help me fix my speakers," and he ... pulled out his penis or whatever, and then—and then I was like, okay, and then—so I sucked his penis again.

The final incident for which Flood was charged occurred on July 3, 1999, at a family cookout hosted by Deborah Flood at her house. The victim testified that when she went inside to use the bathroom, Flood was getting out of the shower:

---

1. We are troubled by the extensive delay between the presentment and the trial in this case. Over four years elapsed after the grand jury returned a presentment charging the defendant with the crimes before the case went to trial. It appears from the pleadings that trial was set and continued on at least seven occasions.

So I was about to walk, and I turned off the light—that was in the bathroom, and he pulled me by my arm. He said, "Come here," like that, and I said, "No." I said, "I want to go back outside," like that. So when we—so he grabbed me by my braids. I had braids, and he bent my head like this [indicates] and kept saying, "You better do it. You better do it. Open your mouth, or I'm not going to quit." So I did, and I wouldn't do it by myself. So he did my head like that [indicates].

Although the victim could not remember exactly what time it was, she testified it was about two o'clock in the afternoon. The victim remembered that when Flood would make her put his penis in her mouth, he would emit "white stuff" and that Flood would wipe the fluid off with a t-shirt.

After the victim testified, the State called the two investigators. The DCS investigator testified that Deborah Flood told him that on July 3, 1999, Flood slept until noon, left the house to pick up his girlfriend, returned to the house, and then left again about three o'clock. The investigator from the Knoxville Police Department confirmed that Flood's mother had told him in an interview that Flood was present for the cookout on July 3, 1999.

Flood's main defense was stated by his attorney in the opening statement: "These things may have happened, but they didn't involve Tim Flood." Flood presented five witnesses, including himself, to establish that he did not have an opportunity to sexually abuse the victim on any occasion and to provide an alibi defense to the July 3rd incident, the only date that was specified by the State. Flood presented two more witnesses to testify to his reputation for truthfulness and attempted to present a witness to rebut the victim's testimony.

As his first witness, Flood called his older brother, Robbie Flood. Robbie testified that he was visiting Deborah Flood's house on the day of the kite incident and that he saw Flood pay the victim for the kite outside. According to Robbie, Deborah Flood's house served as a gathering place for the family, and the layout is open so that you can see into the den from the kitchen and living room. Robbie testified that on July 3, 1999, he arrived at the house for the cookout between eleven and twelve o'clock. Robbie saw Flood arrive at the house, take a shower, and leave. Robbie testified that the victim did not arrive at the house that day until after Flood had left and after the cookout had started at three o'clock.

Flood's next witness was his mother, Deborah Flood. Deborah testified that the house was always full of people coming and going. She testified that the den, where the second incident was supposed to have taken place, opens to the patio where people frequently sit and visit. Deborah testified that on July 3, 1999, Flood left the house before the victim and her mother arrived for the cookout. She remembered because everyone had finished eating before the victim arrived. Deborah also testified that she was home the day of the kite incident and that she did not see anybody inside the house.

After his mother testified, Flood called his twin sister, Tiffany Flood. Tiffany testified that on July 3, 1999, Flood was at the house in the morning but that he left to pick up his girlfriend from work because she was sick. Flood brought his girlfriend to the house where she was picked up by her mother. Flood then took a shower and left for the day. Tiffany testified that the victim and her mother did not arrive until four or five o'clock. She was sure because the cookout started at three

o'clock and everyone had eaten before the victim arrived.

Flood's next witness was a family friend, Melvin Tate. Tate went to the cookout at two o'clock. He testified that when he arrived, neither Flood nor the victim were there. According to Tate, the victim arrived at the cookout around three-thirty or four o'clock.

After Tate testified, Flood attempted to present the testimony of the victim's father, Deoce Dingus, Sr., to testify about a conversation he had with the victim, but the trial court excluded the testimony. The court reasoned that the testimony was hearsay and that it was inadmissible as extrinsic evidence of prior inconsistent statements because Flood had failed to give the victim an opportunity to explain or deny the statements.

Flood then testified. He denied all of the victim's allegations. Flood testified that he did not go inside with the victim on the day of the kite incident and that he paid her for the kite outside. Flood testified that he was never alone with the victim because there were always people and kids around. While admitting that he had a stereo in his bedroom, Flood denied that he had problems with it or that the victim had ever helped him fix it.

Flood testified that on July 3, 1999, he left the house in the morning to pick up his girlfriend from work because she was sick. He brought her back to the house where her mother picked her up around eleven o'clock. Flood testified that after his girlfriend left, he took a shower and went to visit his girlfriend at her house around twelve or one o'clock. After a couple of hours, he left his girlfriend's house and rode around with his cousin and visited a pawn shop. He returned home around eight thirty or nine o'clock. Flood testified that he did not see the victim on July 3, 1999.

To rebut Flood's alibi evidence, the State called the victim's mother and the victim's brother. The victim's mother, La-Tonya Spears ("Spears"), testified that on July 3, 1999, she and the victim arrived at the cookout at about one o'clock and that Flood was at the house. She testified that she and the victim got to the cookout before three o'clock so that she could help prepare the food.

The victim's brother, Deoce, who was fifteen years old at the time of trial, testified that he went to the cookout with his mother and the victim. When he arrived at the cookout, he remembered talking to Flood because it was hot outside and he asked Flood for a popsicle. Deoce testified that the victim told him about the sexual abuse a few days after the cookout: "[S]he said that she didn't like Tim anymore. And I asked her why and she told because, you know, what had happened."

The State rested after the testimony of the victim's brother. At that time, the court removed the jury from the courtroom and allowed Flood to proffer the testimony of the victim's father. The victim's father testified that he talked to the victim after he received a phone call from Flood's mother:

> I asked her what was going on. And she told me, reluctantly, that Timothy Flood touched her. And I asked her, 'What do you mean, touched you?' And she started to tell me that she—he made her touch his penis. And so my conversation with her was, you know, 'Are we sure that this happened?' And she said, 'Yes.'

After the victim's father talked to the victim in her bedroom, he took her directly to the hospital. On the way to the hospital, the victim asked her father if Flood would have to go to jail if someone else were caught: "What she had said is that if

someone else was caught, would Tim still have to go to jail. That's what she said."

Following closing arguments and jury instructions, the jury returned guilty verdicts on four counts of rape of a child. The court sentenced Flood to twenty years in the state penitentiary for each count and ordered that the sentences for counts one and two be served consecutively, resulting in an effective sentence of forty years to be served at 100%. *See* Tenn. Code Ann. § 39–13–523(b) (2003).

The Court of Criminal Appeals reversed the convictions and remanded the case for a new trial. The court held that although the trial court correctly applied the rules of evidence in excluding the testimony of the victim's father, the exclusion of the statements violated Flood's constitutional right to present a defense, relying on *Chambers v. Mississippi*, 410 U.S. 284, 298–301, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). *See also State v. Brown*, 29 S.W.3d 427, 434–35 (Tenn.2000).

We granted permission to appeal to determine whether Flood's right to present a defense was violated. We hold that the trial court properly excluded the testimony from the victim's father. We also hold that the excluded testimony was not so critical to the defense so as to deprive Flood of his constitutional right to due process. We reverse the judgment of the Court of Criminal Appeals.

## II. Analysis

### A. Admissibility of the Evidence

The excluded evidence at issue in this case concerns two statements [2] made by the victim. The first statement was made by the victim to her father in her bedroom shortly after the victim's father learned of the sexual abuse. The victim told her father that Flood had made her touch his penis. The second statement was made by the victim to her father in the car on the way to the hospital. The victim asked her father if Flood would still have to go jail if someone else were caught. The trial court excluded the testimony from the victim's father on two grounds: (1) that the testimony was inadmissible hearsay and (2) that the testimony was inadmissible extrinsic evidence of a prior inconsistent statement.

### 1. Hearsay

Our initial inquiry is to determine whether the trial court properly excluded the testimony from the victim's father as hearsay. Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 802 provides that "[h]earsay is not admissible except as provided by these rules or otherwise by law." "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001), *superseded by statute on other grounds*, 1998 Tenn. Pub. Acts ch. 915, § 1, *as recognized in State v. Odom*, 137 S.W.3d 572, 580–81 (Tenn.2004). As such, we will not reverse the trial court's rulings on this issue absent a showing that it abused its discretion. *Id.*

As to the first statement, we conclude it was properly excluded as hearsay. In addition to arguing that the statement

---

**2.** For ease of reference, we will refer to the excluded evidence in this opinion as the excluded statements even though we hold that

the second statement is non-hearsay because it is not a "statement" for hearsay purposes.

rebuts the victim's testimony, Flood argues that the statement is proof that no oral penetration occurred. To the extent that the statement was offered to show that no oral penetration occurred, it is inadmissible hearsay.[3] The statement does not fall under any hearsay exception. Particularly, the statement is not admissible as an admission by a party opponent under Tennessee Rule of Evidence 803(1.2) because a victim in a criminal case does not meet the definition of a "party." *See City of Chattanooga v. Swift*, 223 Tenn. 46, 442 S.W.2d 257, 258 (1969) (defining the term "party" as meaning "one having a right to control proceedings, to make a defense, to adduce and cross-examine witnesses, and to appeal from the judgment").[4]

As to the second statement, we hold that the trial court improperly excluded the statement as hearsay because the victim's question was not a "statement" for the purposes of hearsay. *See* Tenn. R. Evid. 801(a)(1). Rule 801(c) defines hearsay as a "statement . . . offered in evidence to prove the truth of the matter asserted." Under Rule 801(a), "[a] 'statement' is (1) an oral or written assertion." Despite Flood's insistence that the victim's question implicates someone else in the sexual abuse, it is unclear from the question whether it was intended as any type of assertion.[5] The victim *could* have intended the question as an assertion that someone else committed the sexual abuse. She also could have intended the question as an assertion of her concern for her cousin, or she could have intended it to be just an innocent question, not intended to assert anything. Because nothing in the record suggests that the victim intended an assertion by her question,[6] we conclude that the

---

3. To the extent that the statement was offered solely to rebut the victim's testimony, the evidence must be considered under Tennessee Rule of Evidence 613. The analysis of the statement under Rule 613 is contained in section (II)(A)(2) of this opinion. Also, for hearsay purposes, it is unnecessary to comment on the probative value of the first statement to persuade the jury that no oral penetration occurred.

4. This position is consistent with other jurisdictions that have addressed the issue and held that a victim is not a party to a criminal proceeding. In *State v. Antillon*, 229 Neb. 348, 426 N.W.2d 533 (1988), *superseded by statute on other grounds*, 1989 Neb. Laws, L.B. 443, *as recognized in State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203, 205 (1989), the Nebraska Supreme Court provided the following analysis:

> "Party" is a technical word with a precise legal meaning. It refers to those by or against whom a legal suit is brought; the party plaintiff or defendant. All others who may be affected by the suit, indirectly or consequentially, are persons interested, but are not parties. *Banks v. Rockwell Intern. N. American Aircraft Operations*, 666

F.Supp. 1053 (S.D.Ohio 1987); *Golatte v. Mathews*, 394 F.Supp. 1203 (M.D.Ala.1975). Again, it is clear that the victim, as a victim-witness, did not meet the legal definition of party to the case. His role in the action was not to bring or defend against charges, but merely to provide testimony about the allegations. As such, he was not a party-opponent, as the lower court properly ruled.
426 N.W.2d at 538.

5. We note that questions are often not hearsay because they are not offered to prove the truth of their content. *See* Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.01[10] (5th ed.2005); *see, e.g., United States v. Jackson*, 88 F.3d 845, 848 (10th Cir.1996) (holding that the question, "Is this Kenny?" was non-hearsay because it could not "reasonably be construed to be an intended assertion"). "On rare occasions a question may be hearsay because it is used to prove an implicit assertion. An example is, 'Why did you wreck my boat?' " Cohen, *supra* § 8.01[10] n. 52.

6. *Cf. Jackson*, 88 F.3d at 848 (stating that "[Federal Rule of Evidence] 801 places 'the burden upon the party claiming that the intention [to make an assertion] existed; ambig-

victim's question was not a "statement" for the purposes of hearsay. *See State v. Land,* 34 S.W.3d 516, 525 (Tenn.Crim.App. 2000) ("[N]othing is an assertion unless intended to be one."); *see also* Neil P. Cohen et al., *Tennessee Law of Evidence,* § 8.01[4][b] (5th ed.2005).

### 2. *Prior Inconsistent Statement*

The trial court also ruled that the testimony of the victim's father was inadmissible to rebut the victim's testimony. Tennessee Rule of Evidence 613(b) states that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon."

▮▮▮ Flood offered the first statement to rebut the victim's testimony that he penetrated her mouth with his penis. We fail to see how the victim's statement to her father that Flood made her touch his penis rebuts her testimony that Flood placed his penis in her mouth on four occasions. The victim was eight years old and was describing to her father in her own words what Flood did to her. But to the extent that the statement has any tendency to rebut the victim's testimony, the trial court was correct in excluding this statement under Tennessee Rule of Evidence 613(b). The evidence was not admissible by extrinsic evidence because Flood failed to examine the victim as to the statement during cross-examination.

▮▮▮ Flood offered the second statement to rebut the victim's testimony that identified Flood as the person who committed the sexual abuse. Again, we fail to see how the victim's statement rebuts her testimony. The victim asked her father if Flood would have to go to jail if someone else were caught. As discussed above, the record does not justify a conclusion that the victim intended to make an assertion by her question. But to the extent that the statement has any tendency to rebut the victim's testimony, the trial court was correct in excluding it as a prior inconsistent statement. Flood offered the testimony to rebut the victim's testimony, but Flood failed to follow the procedures under Tennessee Rule of Evidence 613(b) for admitting the evidence. Rule 613(b) is clear that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is *not* admissible unless and until the witness is afforded an opportunity to explain or deny" the statement. (Emphasis added). Having failed to afford the victim this opportunity, the second statement was not admissible.[7]

In summary, we hold that the trial court did not err in excluding the first statement. And notwithstanding that the second statement was non-hearsay, we hold that the trial court did not err in excluding the second statement because it was inadmissible as extrinsic evidence of a prior inconsistent statement.

### B. *Right to Present a Defense*

▮▮▮ Exclusions of evidence may violate the Due Process Clause of the Four-

---

uous and doubtful cases will be resolved against him and in favor of admissibility.' '') (quoting Fed.R.Evid. 801 advisory committee's note).

7. Even though the statement was non-hearsay, we do not believe that this is a situation where the trial court should have admitted

the evidence with a limiting instruction under Tennessee Rule of Evidence 105. A limiting instruction that the evidence could be considered to prove the truth of the matter asserted but not to rebut the victim's testimony would have confused the jury, especially in light of the fact that the statement itself was not an assertion.

teenth Amendment of the United States Constitution even if the exclusions comply with rules of evidence. Principles of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony. *See Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *State v. Brown,* 29 S.W.3d 427, 431 (Tenn.2000). In *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) the United State Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

388 U.S. at 19, 87 S.Ct. 1920.

However, the right to offer testimony is not absolute: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence...." *Chambers,* 410 U.S. at 302, 93 S.Ct. 1038. Rules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process. *Id.* So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense. *United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998);[8] *see also Holmes v. South Car-*

*olina,* 547 U.S. 319, 126 S.Ct. 1727, 1731, 164 L.Ed.2d 503 (2006); *see, e.g., Chambers,* 410 U.S. at 302, 93 S.Ct. 1038 (rejecting as "narrow and unrealistic" the evidentiary rule that did not allow defendant to impeach his own witness).

Because "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *Scheffer,* 523 U.S. at 308, 118 S.Ct. 1261, "[a]n evidentiary ruling ordinarily does not rise to the level of a constitutional violation," *State v. Rice,* 184 S.W.3d 646, 673 (Tenn. 2006) (citing *Crane v. Kentucky,* 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). In determining whether an exclusion of evidence rises to the level of a constitutional violation, we consider the following:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and
>
> (3) Whether the interest supporting exclusion of the evidence is substantially important.

*Brown,* 29 S.W.3d at 434–35; *Rice,* 184 S.W.3d at 673; *State v. Rogers,* 188 S.W.3d 593, 614 (Tenn.2006). We hold that the exclusion of the statements in this case did not violate Flood's right to present a defense. While the excluded statements may have indicia of reliability, the statements were not critical. We also hold that the interests supporting exclusion of the evidence are substantially important.

### 1. Critical to the Defense

The excluded evidence was not critical because the testimony from the victim's father had little, if any, probative value,

---

**8.** While parts of *Scheffer* garnered only a plurality of the members of the Court, for this proposition, a majority of the members of the Court agreed.

and the exclusions did not undermine any elements of Flood's defense. *See Scheffer*, 523 U.S. at 315, 118 S.Ct. 1261 (recognizing that an exclusion of evidence is unconstitutional when it "significantly undermine[s] fundamental elements of the accused's defense"). Furthermore, the victim's statement that Flood made her touch his penis and her question of whether would Flood still have to go to jail if someone else were caught are not the type of evidence that has previously been recognized as critical. *See Chambers*, 410 U.S. at 302, 93 S.Ct. 1038; *Brown*, 29 S.W.3d at 434–36; *see also Rock v. Arkansas*, 483 U.S. 44, 62, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Crane v. Kentucky*, 476 U.S. 683, 691, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *Green v. Georgia*, 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979).

In *Chambers*, the trial court limited the defendant in his cross-examination of McDonald who had confessed to the crime for which the defendant was being tried. 410 U.S. at 295, 93 S.Ct. 1038. The defendant was prohibited from cross-examining McDonald on the basis of a common-law rule that a party may not impeach his own witness. *Id.* The trial court also excluded as hearsay the testimony of three witnesses, who would have testified that they heard McDonald confess to the crime. *Id.* at 298, 93 S.Ct. 1038. The United State Supreme Court held that the excluded evidence was critical to the defense because it implicated constitutional rights "directly affecting the ascertainment of guilt." *Id.* at 302, 93 S.Ct. 1038.

In *Brown*, the defendant was indicted on four counts of sexual abuse of an eleven-year-old family member. 29 S.W.3d at 429. The trial court excluded hearsay testimony that the victim stated that she had sexual intercourse with an adolescent male during the same time period that the de-fendant allegedly committed the rape, which the defendant presented to explain the tears in the victim's hymen. *Id.* We concluded that the evidence was critical because it rebutted the State's medical proof and offered an alternative explanation for the hymenal injury. *Id.* at 435–36.

 While previous cases are instructive, we note that whether excluded evidence is critical to a defense is a fact-specific inquiry. *See Chambers*, 410 U.S. at 303, 93 S.Ct. 1038 ("Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial."). Assuming that the excluded statements have some probative value to rebut the victim's testimony that Flood put his penis in her mouth or to suggest that another person is responsible for the crimes, the statements are not clear enough to make the evidence critical to the defense under the facts and circumstances of this case. The statements made by the victim in this case are unlike the hearsay testimony of additional confessions that was excluded in *Chambers*, *see* 410 U.S. at 298, or the testimony rebutting the State's medical proof that was excluded in *Brown*, *see* 29 S.W.3d at 434. Here, the excluded statements, even if admitted for their substantive truth, are not exculpatory. They have little probative value to either implicate another in the crime or to rebut the victim's testimony that oral penetration occurred. In fact, it could be argued that the excluded statements tend to support the prosecution as much they tend to support the defense. Flood was excluded from introducing the victim's question to her father on the way to the hospital that if someone else were caught, would Flood still have to go to jail. While the question might tend to implicate someone else, it also tends to show the concerns of an eight-year-old girl for her older cousin.

The victim's statement that Flood made her touch his penis might tend to rebut the victim's testimony, but it also tends to corroborate it. In light of the victim's other testimony that identified Flood as the person who placed his penis in her mouth on four occasions, we conclude that the excluded statements were not critical to Flood's defense. *See Rice,* 184 S.W.3d at 673–74; *Rogers,* 188 S.W.3d at 614; *State v. Powers,* 101 S.W.3d 383, 396–97 (Tenn.2003).

▇▇▇ We also note that Flood is unlike the defendant in *Chambers* because Flood was not totally foreclosed from presenting the proffered evidence by the Tennessee Rules of Evidence. The victim was available for cross-examination. Flood could have asked the victim about the statements. If the victim denied making the statements, Flood could have introduced the statements into evidence through the victim's father pursuant to Tennessee Rule of Evidence 613. Flood had the opportunity to question the victim about the statements but did not do so. Generally, the right to present a defense is not denied when a defendant does not pursue a line of questioning during cross-examination.

We disagree with the Court of Criminal Appeals that the lack of physical evidence made the excluded testimony of the victim's father critical. Flood's defense consisted of five witnesses who testified that Flood did not have an opportunity to sexually abuse the victim on any occasion and who testified that Flood was not at Deborah Flood's house to abuse the victim on July 3, 1999. The State presented two rebuttal witnesses who testified that Flood was at the house with the victim on July 3, 1999. Flood argues that the statements made by the victim to her father were critical because they rebutted the victim's testimony. To an extent, all five witnesses presented by Flood rebutted the testimony of the victim because she testified that Flood sexually abused her on four occasions and in particular on July 3, 1999. Hearing all of this testimony, the jury convicted Flood of four counts of rape of a child. Under the facts and circumstances of this case, we conclude that the excluded statements made by the victim to her father were not critical to Flood's defense.

### 2. Indicia of Reliability

We agree with the Court of Criminal Appeals that the victim's statements to her father have some indicia of reliability. The victim made the statements to her father in confidence under circumstances in which she had no incentive to be dishonest. However, the consideration of the reliability of a statement is limited by the amount of probative value that the underlying statement contains. In this case, while the statements appear to be reliable, they have little probative value to either implicate another in the crime or to rebut the victim's testimony that oral penetration occurred. The statements also lack some of the indicia of reliability that have been present in other cases. In *Chambers,* the excluded statements were made spontaneously and were supported by the corroborating evidence of McDonald's sworn confession to the defendant's attorneys. 410 U.S. at 287, 93 S.Ct. 1038; *see also Green,* 442 U.S. at 97, 99 S.Ct. 2150. Flood did not present any corroborating evidence that another person committed the acts of sexual abuse or that the abuse only involved the "touching" of his penis.

We conclude that while the excluded statements that the victim made to her father contained some indicia of reliability, this consideration is not determinative of the admissibility of the victim's statements under the facts and circumstances of this case.

### 3. Interest Supporting Exclusion

■ The interests supporting exclusion in this case are the interests behind Tennessee Rules of Evidence 802 and 613(b). Rule 802 provides generally that hearsay is not admissible. The United States Supreme Court described the interest behind the hearsay rule in *Chambers:*

> The hearsay rule, which long has been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of the statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.

410 U.S. at 298, 93 S.Ct. 1038. Rule 802 serves an important interest in excluding testimony that is untrustworthy.

■ Rule 613(b) prohibits the introduction of extrinsic evidence of a prior inconsistent statement unless the witness is given the opportunity to explain or deny the statement. The interest behind the rule is one of fairness to the witness. It is unfair to attempt to impeach a witness's character for truthfulness with proof of statements made on other occasions without first giving the witness an opportunity to respond. *See Moore v. Bettis,* 30 Tenn. (11 Hum.) 67 (1850) (holding that it is a "manifest injustice" to impeach a witness's character without first calling the witness's attention to the statement). Other purposes of Rule 613(b) are that it provides for an orderly presentation of evidence and testimony, saves time when the witness admits to having made the statement, and

lessens the risk that the jury will consider extrinsic evidence as substantive evidence. *State v. Martin,* 964 S.W.2d 564, 567 (Tenn.1998).

For these reasons, we conclude that the interests behind Tennessee Rules of Evidence 802 and 613(b) are substantially important.

### III. Conclusion

We hold that the trial court did not err by excluding the victim's out-of-court statements. We also hold that Flood was not deprived of his constitutional right to present a defense by the trial court's exclusion of the victim's statements to her father. The trial court's exclusion of the victim's statements does not rise to the level of a constitutional violation because the statements were not critical to the defense. The judgment of the Court of Criminal Appeals is reversed.

It appearing that the appellee, Timothy Flood, is indigent, costs in this case are taxed to the State of Tennessee.