# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 9, 2013

## STATE OF TENNESSEE v. LAMONT JOHNSON

**Appeal from the Circuit Court for Gibson County**
**No. 8954     Clayburn Peeples, Judge**

---

**No. W2012-01271-CCA-R3-CD  - Filed May 30, 2013**

---

After a trial by jury, the defendant was found guilty of the first degree felony murder of his girlfriend's five-month-old daughter.  On appeal, the defendant claims that the trial court's decision to exclude the testimony of four potential witnesses concerning the defendant's son's propensity toward violence violated his constitutional right to present a defense.  After reviewing the record, we conclude that the defendant has failed to establish that the testimony of these four witnesses was critical to the defense.  In addition, strong societal interests support the exclusion of this type of character evidence when nothing in the record might suggest that the defendant's son actually committed the crime.  Consequently, the trial court's decision to exclude the testimony of these witnesses did not violate the defendant's constitutional right to present a defense.  The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., AND JEFFREY S. BIVINS, JJ., joined.

Tom W. Crider, District Public Defender, and Linda Moore, Assistant Public Defender, for the appellant, Lamont Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Gary Brown, District Attorney General; and Hillary Lawler Barham and Jason Scott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On March 1, 2010, the defendant was indicted on one count of first degree felony

murder in violation of Tennessee Code Annotated section 39-13-202. The indictment alleged that the defendant unlawfully killed the five-month-old victim during the perpetration of aggravated child abuse. The charges stemmed from activity that occurred on July 8, 2009.

At 12:33 p.m. on that date, the defendant called 911 and reported that the victim was not breathing. When EMTs arrived at the scene, they observed the defendant and a lifeless infant on the floor. The EMTs immediately began CPR and transported the victim to the hospital. An emergency room physician and the hospital's staff attempted pediatric lifesaving procedures for approximately one hour before the victim was declared dead.

The victim's autopsy revealed that she had died of multiple blunt force injuries to her head, chest, and abdomen. Based on a timeline provided by the defendant and the victim's mother, investigators concluded that only the defendant and his son were at home with the victim when the injuries occurred. When confronted with the autopsy findings, the defendant claimed to investigators that the victim had stopped breathing after she had fallen off of a sofa. However, experts at the defendant's trial later opined that the victim's injuries were not consistent with her having fallen off of a sofa and could not have been caused by the administration of CPR. One expert opined that the victim's injuries—which included retinal detachment, massive internal bleeding, a front-to-back skull fracture, and multiple rib fractures—could only have been caused by "extraordinarily violent" shaking that "would be very frightful to someone who was watching it."

At the defendant's trial on December 12-13, 2011, the defense predicted in its opening statement that the prosecution's witnesses would not tell "the whole story" concerning the incident and stated its confidence that after considering all of the evidence the jury would feel compelled to return with a verdict of not guilty. At no point during that statement was any reference made to the defendant's eight-year-old son. However, during the defense's cross-examination of the State's penultimate witness, the victim's mother, defense counsel asked questions apparently intended to cast suspicion upon the boy.

During her direct testimony, the victim's mother testified that she and her children were living together and that the defendant had been in the process of moving in with them when the incident occurred. She also gave testimony about the events that transpired at the hospital following the incident, and she related her grief when she learned that her daughter had died. She testified concerning the defendant's behavior on the day of the incident and on the following day, which involved fainting, drinking, smiling, and laughing at various points. She described the couple's initial interviews with the police after the victim's death was ruled a homicide. She testified that prior to the police investigation, the defendant had never mentioned anything to her about the victim having fallen off of a sofa. She testified that she first learned that the defendant was making such a claim from the investigating

officers.

During the victim's mother's cross-examination, however, the defense focused almost exclusively on the witness's feelings concerning the defendant's son. The victim's mother testified that the defendant's son lived nearby with his mother and that he would frequently come over to her house to spend the night. The victim's mother acknowledged that she had seen the defendant's son hold the victim in the past. The victim's mother admitted that she had asked one of the investigators if the defendant's son had been anywhere around the victim on the day of the incident. The victim's mother also testified that the defendant's son had been in lots of trouble at school, had "all sorts of problems" with fighting and violence, and that she was "[j]ust a little bit" concerned about the defendant's son being around her children.

After this testimony, the State's final witness, an investigating officer, testified concerning the investigation generally and discussed a statement given by the defendant to police, in which he claimed to have left the victim on a living room sofa while he made her a bottle and that she fell on the floor, "crying loudly," when he came back in. The witness testified that the defendant claimed to have noticed that the victim was having difficulty breathing shortly afterward.

During cross-examination, defense counsel questioned the witness concerning the degree to which the defendant's son had been investigated as a possible suspect. The witness replied that the defendant's son had undergone a "forensic interview." The witness testified that the defendant's son had told them that he had been in the back bedroom playing video games throughout the relevant time period and that he had not seen anything that had transpired. Defense counsel asked the witness if he had spoken to anyone at the defendant's son's school concerning the defendant's son's reputation as a bully, and the witness replied, "No sir." At this point, the record reflects that a bench conference was held, but the conference was not recorded.[1]

Following this testimony, the State rested. Before the defense began its case the following morning, the State made an oral "objection" in response to the defense's apparent intent to offer character evidence concerning the defendant's son. The State argued that presenting such evidence was "prohibited by the law and prohibited by the rules" if it was

---

[1] The defendant asserts that during this bench conference the defense was directed not to ask the witness further questions concerning the defendant's son's teachers or behavior at school. The defendant contends that this bench conference was not recorded due to the incompetence of the out-of-town court reporter assigned to the case. For purposes of resolving the defendant's claim, we will accept these assertions as true.

offered for purposes of showing that the child acted in conformity with some particular character trait on the day in question. The defense responded that it intended to introduce the testimony of four of the defendant's son's teachers concerning the defendant's son's "general conduct," as well as some of the defendant's son's "specific acts," such as "threatening to kill students" and "saying he was going to harm students" with various objects that he had brought to school. The defense claimed that it was entitled to show to the jury that "this is perhaps an extraordinary child" and that the proffered evidence fell under one of the exceptions to the general prohibition against character evidence imposed by Tennessee Rule of Evidence 404(b). The State argued that Rule 404(b) only applied to defendants in a criminal case, not other witnesses, and consequently the evidence was not admissible.

The trial court asked the defense if any proof had been presented that the defendant's son had committed the crime. The defense responded that it only wanted to prove that the defendant's son had the "opportunity and capacity" to commit the crime. The trial court agreed that the defendant had "an absolute right to present any evidence that someone else committed the crime," but disagreed that the defendant had the right to present evidence that proved only that someone else was merely "capable of committing the crime." The trial court concluded by stating "I'm going to grant the State's motion."

After the State's "motion" was granted, the defendant was advised of and waived his right to testify in his own defense pursuant to the procedures established in *Momon v. State*, 18 S.W.3d 152, 162-63 (Tenn. 1999), and the defense rested without putting on any proof. During closing arguments, the defense discussed the prosecution's failure to prove the identity of the perpetrator and briefly mentioned the defendant's son as a possible alternative suspect. However, the defense primarily argued that the prosecution had failed to "connect all the dots" and prove its case beyond a reasonable doubt.

After being duly instructed, the jury retired to deliberate at 10:42 a.m. on December 13, 2011, and returned with a verdict finding the defendant guilty as charged at 11:37 a.m. that same day. The defendant was sentenced to life in prison. The defendant filed a timely motion for new trial and an amended motion. The trial court denied the motion. The defendant filed a timely notice of appeal.

With his amended motion for new trial, the defendant filed four affidavits from the defendant's son's former school teachers discussing the defendant's son's behavior at school. These affidavits generally describe the defendant's son's adoption of the "gangster" lifestyle and propensity toward sudden outbursts of violence, as well as his habit of fighting, using profanity, and issuing death threats. One mentions an incident in which the police had to be called to the defendant's son's school "to get [the defendant's son] under control." Another

opines that "[w]ithout a doubt, it is my opinion that [the defendant's son] had the capacity to hurt another child (or baby) seriously." The teachers generally claim that they would have testified in a manner consistent with their affidavits had they been permitted to do so at the defendant's trial. In light of these affidavits and the record in this case, we proceed to consider the defendant's claim.

## ANALYSIS

The defendant claims that his constitutional right to present a defense was violated by the trial court's ruling that the defendant's son's four teachers could not testify concerning the defendant's son's propensity toward violence and dangerous behavior at school. The defendant asserts that this evidence "was all [the defendant] had for a defense," and consequently that excluding it violated the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Constitution of the State of Tennessee. For the reasons that follow, we disagree.

Defendants in criminal cases have the right to mount a defense against the charges against them. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). The right to call witnesses on their behalf is a key component of this right. *See id.* This right, however, is not absolute, "and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," such as the consistent application of rules governing evidence and procedure. *Id.* at 295; *see also State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). Because "[r]ules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process," if "the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, [they] do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316. Courts generally afford "state and federal rulemakers . . . broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Id.* (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). In deciding whether the exclusion of evidence pursuant to an evidentiary rule amounts to a constitutional violation of a defendant's right to present a defense, courts consider: "(1) [w]hether the excluded evidence is critical to the defense; (2) [w]hether the evidence bears sufficient indicia of reliability; and (3) [w]hether the interest supporting exclusion of the evidence is substantially important." *Id.* Consideration of these factors leads this court to the conclusion that the defendant's constitutional rights were not violated by the trial court's decision to exclude the testimony of the four teacher-witnesses.

Under the circumstances of this case, the testimony at issue was not critical to the defense. The defendant claims that the testimony of the teacher-witnesses was "all [he] had for a defense," and the record does reflect that the defendant called no witnesses and presented no testimony after the trial court excluded these witnesses. However, the fact that

the testimony of these witnesses was the only evidence that the defendant had intended to present does not necessarily render it "critical" to his defense. During the defendant's opening statement—well before any decision concerning the admissibility of the teacher-witnesses' testimony had been made—the defense made no mention of the defendant's son as a possible suspect, nor did it discuss the anticipated testimony of any of the teacher-witnesses. Even in closing arguments, after the defense had succeeded in presenting some evidence concerning the defendant's son's character through skillful cross-examination of the State's witnesses, the defense did not dwell on this issue. The defense strategy throughout the case was primarily to argue that the prosecution had failed to meet its burden of proof. Successful use of this particular strategy required the presentation of no evidence whatsoever. To the extent that the defense also sought to suggest that the defendant's son was a possible alternative suspect, evidence sufficient to allow the defense to use this tactic had already been presented to the jury by the victim's mother, who testified that: (1) the defendant's son had problems with violence and fighting; (2) the defendant's son was present in the same home as the victim on the day in question; and (3) she had expressed her concern about that situation to others.

The proferred testimony of the four teacher-witnesses would have supported the victim's mother's favorable testimony on these particular issues in only one aspect—they would have agreed that the defendant's son had an unusually strong propensity toward violence. The witnesses had no direct knowledge whatsoever concerning any other issue relevant to any attempt to cast suspicion on defendant's son as a viable alternative suspect, such as whether the defendant's son had any motive to commit the crime or had any physical contact with the victim on the day in question. Their testimony related to but a single piece of a much larger argument, and even concerning that one piece, it is not clear that the testimony of these witnesses would have added any significant weight to the testimony on the subject that had already been given by the victim's mother. The fact that the defendant's son had the capacity to commit acts of violence could not have been more clearly conceded by the victim's mother during her cross-examination. The State did not dispute this issue. Consequently, notwithstanding the fact that the testimony of these four teacher-witnesses would have constituted the entirety of the defense's case-in-chief had it been admitted, this evidence was not actually "critical" to the defendant's chosen defense.

Moreover, the societal interest underlying the exclusion of this evidence is substantial. To the extent that the testimony of the teacher-witnesses could have been valuable to the defense, it was valuable only as negative character evidence. Society has an appreciable interest in excluding this type of character evidence on these facts. Presenting evidence of an individual's prior bad acts for the specific purpose of establishing that the individual at issue is a "bad" person who did something particularly bad on the day in question is generally frowned upon and, when that individual is a criminal defendant, generally

forbidden—subject to a few specific exceptions. *See* Tenn. Rule Evid. 404(b) ("Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion. . . ."). While Rule 404(b) does not prohibit the introduction of character evidence against an individual other than a criminal defendant, *see State v. DuBose*, 953 S.W.2d 649, 653 (Tenn. 1997) ("Evidence of crimes, wrongs or acts, if relevant, is not excluded by Rule 404(b) if the acts were committed by a person other than the accused. . . ."), it nonetheless evidences a societal concern that character or propensity evidence may be accorded disproportionate weight by, or serve to confuse, a jury.[2]

Negative character evidence offered against someone other than a criminal defendant is still subject to the remaining rules of evidence. The general default rule that "[a]ll relevant evidence is admissible," established by Rule 402, still applies, as does its proviso that "[e]vidence which is not relevant is not admissible." Tenn. R. Evid 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. Unfair prejudice is "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm. Note).

The trial court carefully considered the relevance issue, and it determined that the testimony of the four teacher-witnesses was simply not relevant. As the trial court explained, while the proffered testimony could help prove that the defendant's son had the capacity to commit the crime, in the absence of any evidence that might suggest that the defendant's son had actually committed the crime, the testimony was not relevant to any fact of consequence to the case. According to the defendant's statement to police, the victim's injuries were sustained in a fall from a sofa. According to statements given by both the defendant and his son, the defendant's son was playing video games in another room when the victim's injuries occurred. The defense acknowledged that it had no evidence suggesting that the defendant's son had in fact committed the crime.

By presenting the testimony of the four teacher-witnesses concerning the defendant's son's behavior at school, the defendant merely hoped to create reasonable doubt via rumor, insinuation, and innuendo. Society has a strong interest in preventing important legal matters from being decided on such improper bases. Society also has a strong interest in protecting an eight-year-old boy from public character assassination when no evidence exists tying him

---

[2] We also note that the evidence could not be admissible under Rule 607, 608, or 609 because the defendant's son was not called as a witness.

to the crime.

Because the proffered testimony of the four teacher-witnesses was not critical to the defendant's chosen defense (which was based on the theory that the prosecution had simply failed to meet its burden of proof), and because society has an important interest underlying the evenhanded application of the evidentiary rules excluding this type of negative character evidence in this type of situation (in that its admission poses a serious risk that the jury might decide the case on emotional grounds rather than hard facts), the trial court's decision to exclude the testimony of the four teacher-witnesses did not violate the defendant's constitutional right to present a defense. The defendant has failed to demonstrate entitlement to any relief.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE