# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 11, 2015 Session

## STATE OF TENNESSEE v. PHILLIP K. ADAMS

### Appeal from the Circuit Court for Williamson County
#### No. ICR056413    Michael Binkley, Judge

---

### No. M2014-00501-CCA-R3-CD – Filed June 19, 2015

---

Defendant, Phillip K. Adams, was indicted by the Williamson County Grand Jury for driving under the influence of an intoxicant (DUI), driving while his blood alcohol concentration was .08 percent or more (DUI per se), and DUI, second offense. Following a jury trial, Defendant was convicted of DUI second offense and sentenced to 11 months and 29 days, to be suspended after serving 60 days in confinement. On appeal, Defendant contends that: 1) the trial court erred by not allowing Defendant to present the expert testimony of his co-worker Travis Adams at trial; 2) the trial court erred by not allowing Defendant to testify as an expert witness at trial; and 3) the trial court deprived Defendant of his right to due process by preventing him from presenting a defense. Having reviewed the record before us and the briefs of the parties, we conclude that the trial court did not abuse its discretion. Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Vanessa P. Bryan, District Public Defender; and Benjamin Signer, and Robert W. Jones, Assistant Public Defenders, Franklin, Tennessee, for the appellant, Phillip K. Adams.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Kim R. Helper, District Attorney General; and Carlin Hess, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

*Facts*

Deputy David Borden, of the Williamson County Sheriff's Office, was on patrol in the early morning hours of October 16, 2011. He observed a vehicle make an illegal u-turn at the intersection of West McEwen and Carruthers Parkway. He then observed the car driving "at a high rate of speed." Deputy Borden's radar showed the car was traveling at 51 miles per hour in a 40 mile-per-hour speed limit zone. Deputy Borden activated his blue lights and siren and followed the vehicle onto I-65. The vehicle stopped, and Deputy Borden approached the driver of the vehicle, whom Deputy Borden identified at trial as Defendant. Deputy Borden noticed "a very heavy odor of alcohol." He testified that he asked Defendant for his driver's license and registration, and Defendant did not make eye contact with Deputy Borden. Deputy Borden testified that Defendant covered his mouth with his hand. Deputy Borden suspected that Defendant might be impaired because of "the smell of the alcohol and him trying to mask it like that[.]" Deputy Borden asked Defendant to exit the vehicle and perform field sobriety tests. Deputy Borden asked Defendant if he had been drinking alcohol, and Defendant told him that he drank four beers and a "Fireball."

Deputy Borden instructed Defendant to perform the nine-step walk-and-turn test. Deputy Borden testified that Defendant performed "poorly" on the test. Defendant "stepped off the line several times while walking the nine steps." Defendant also "raised his arms to catch himself from [losing] his balance and he did an improper turn . . . ." Deputy Borden then instructed Defendant to perform the "one leg stand." Defendant also performed "poorly" on that test. Defendant "put his foot down and raised his arms for balance." Finally, Deputy Borden instructed Defendant to recite the alphabet from C to X, and Defendant "missed some letters." Deputy Borden placed Defendant in custody and read the implied consent form to him. Defendant consented to submit to a blood alcohol test, and Deputy Borden transported Defendant to the Williamson County Medical Center. On cross-examination, Deputy Borden testified that Defendant was cooperative.

Special Agent April Hagar of the Tennessee Bureau of Investigation analyzed Defendant's blood sample. She was qualified by the court as an expert in forensic toxicology. She testified that she received the blood alcohol kit containing Defendant's blood sample on October 28, 2011. The sample was collected on October 16, 2011. The blood sample was contained in a "gray stopper tube" that contained a preservative and an anticoagulant. Agent Hagar testified that tests have been conducted which show that a blood sample can be accurately tested for "probably five years" after collection. She testified, "the only thing that's going to happen is you're going to have less alcohol that's

going to occur over time. There's not going to be more alcohol, there's going to be less alcohol." Agent Hagar testified that Defendant's blood alcohol level was .18 percent. On cross-examination, Agent Hagar testified that sodium fluoride was the most commonly used preservative for blood. She testified that if a preservative failed to perform its function, "then you could have ethanol reduction."

Defendant testified that Deputy Borden told him that he stopped him because he was speeding at 51 miles per hour and because he made an illegal u-turn. Defendant testified, "I knew that was way, way wrong. I knew there was something sort of – something sort of off about that, so I sort of just tried to play along so I could just go ahead and get through with the experience[.]" Defendant testified that when Deputy Borden instructed him to do the nine-step walk-and-turn, Defendant told Deputy Borden that his "balance is sort of way off because at work [he has] to carry like eighty pound cylinders easily one hundred feet all day every day." Defendant testified, "after doing that . . . your knees will be sore for like days and days, so anytime I try to do any kind of balancing act or anything it's going to be sort of thrown off."

On cross-examination, Defendant testified that he had just left his friend's apartment when Deputy Borden stopped him. Defendant testified that he drank four beers between approximately 8:00 p.m. and 2:50 a.m. He testified that he drank two beers at his friend's apartment between 8:00 p.m. and 10:00 p.m. He and his friend went to "Drake's" from 10:00 p.m. to 12:00 a.m., and Defendant drank one 16-ounce beer. Then, they returned to his friend's apartment where Defendant drank another beer before he left. Defendant testified that he did not drink a "Fireball" shot. Defendant equivocated and testified, "I don't recall if I did. I remember there being a Fireball bottle there, but I don't recall taking a shot." Defendant testified that his car "is not in the best condition" and had "a vacuum leak at the time." He testified that his car could not have reached a speed of 51 miles per hour "in that short of distance." Defendant believed that the vehicle Deputy Borden saw make an illegal u-turn and speed off was not Defendant's vehicle. Defendant testified that he was "[w]orking on paperwork" at his friend's apartment.

### Defendant's offers of proof

Defendant called his co-worker, Travis Adams, to testify as an expert witness. The State objected to the testimony of Mr. Adams, arguing that his testimony was not relevant. The State also asserted that Defendant did not provide any report or memorandum of the content of Mr. Adams' testimony. The trial court stated, "[m]y concern is the discovery violation." The following exchange occurred:

3

[Prosecutor]: Therefore, it's an ambush. I mean the state has no way of calling him beforehand to figure out how he knows this to attack his credibility, to attack his conclusions. I have no idea whatsoever.

THE COURT: I know. I really kind of agree with that. I mean why wasn't the state notified of this expert, the basis of his opinion, and some written report that serves as noticing them of what you're going to do with an expert, quote unquote? I don't know if he qualifies or not. That's what concerns me.

[Defense counsel]: Your Honor, I met with him for the first time just before lunch. I've never had time to actually even talk about what he's going to talk about with him prior to that, so it's fresh and brand new to me.

The trial court subsequently allowed Defendant to make an offer of proof of Mr. Adams' testimony. Mr. Adams testified that he was a chemist, and he was employed at Polar Technology. He had known Defendant "from work" since June, 2013. Mr. Adams testified that he regularly worked with Freon. He testified that frequent exposure to Freon causes "an increase in the amount of refrigerants or Freon in [people's] blood just from the exposure through skin contact and inhalation." Mr. Adams testified that Freon in a person's blood would prevent the preservatives intended to preserve a blood sample "from doing the job of preserving the sample due to the polarity of the molecules and the salts in the preservatives." Mr. Adams testified that he had experience using machines that are used to test blood samples for alcohol content.

Defendant also made the following offer of proof. Defendant testified that he worked as a chemist at Polar Technology. Defendant has a degree in biochemistry. Defendant testified that he came into contact with Freon in his work. Defendant testified that frequent contact with Freon would cause Freon to enter a person's bloodstream. Defendant testified that Freon in a person's blood sample would prevent the preservative used in the blood sample container from preserving the blood sample.

*Analysis*

Defendant contends that the trial court abused its discretion by not allowing him to present the expert testimony of Travis Adams and Defendant. He asserts that the testimony would have been that Defendant's blood was contaminated with a chemical that would have prevented his blood sample from being preserved for testing.

4

Expert testimony, like other evidence, must be relevant in order to be admissible. *See* Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Relevant evidence is defined as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. This court reviews a trial court's decisions concerning the admissibility of expert evidence under an abuse of discretion standard, and will reverse a decision only "'when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" *State v. Parker*, 350 S.W.3d 883, 897 (Tenn. 2011) (quoting *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

The admission of expert testimony is governed by Tennessee Rule of Evidence 702, which provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. "The witness may acquire the necessary expertise through formal education or life experiences." *State v. Reid*, 91 S.W.3d 247, 302 (Tenn. 2002) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 7.02[4] (4th ed. 2000)). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person." *Id.* The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002) (emphasis omitted).

In *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn. 1997), our supreme court recited several nonexclusive factors that a court may consider in determining the reliability of scientific testimony, including:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 274 (Tenn. 2005) (quoting *McDaniel*, 955 S.W.2d at 265). Not all expert testimony will "fit" with these factors, thus the exact considerations that may be appropriate will vary depending upon "the

5

nature of the issue, the witness's particular expertise, and the subject of the expert's testimony." *Brown*, 181 S.W.3d at 277.

Defendant contends that his testimony and his co-worker's testimony "would have cast doubt on the reliability of [Agent Hagar's] test by raising an issue about how the preservatives in the blood test might interact with [Defendant]'s blood." The State asserts that the proffered testimony of Defendant and his co-worker failed to meet the threshold of reliability and would not have substantially assisted the trier of fact.

During Defendant's proffer of Travis Adams' testimony, the trial court stated:

> Let me just say this, I don't see the connection yet. Well, first of all, I don't see an identifiable area of expertise that will assist the jury in trying to make a decision one way or the other on any particular fact that we've heard thus far. It may be that we haven't heard it yet. But I don't know the area of expertise. It really doesn't matter at this time because this is an offer of proof. However, for my benefit and for the record's benefit, I see no identifiable area of expertise that would help the jury in any particular area. That's all I'm going to say at this time.

Defendant did not present any proof that his blood sample contained Freon, and he provided no evidence to support his theory that the presence of Freon in the blood would produce an inaccurate blood alcohol content test result. Considering the *McDaniel* factors, Defendant did not testify that his theory had been subjected to peer review or provide information that it was generally accepted in the scientific community. Neither Defendant nor his co-worker testified to "testing, research, studies, or experience-based observations" to support their conclusions. *See Stevens*, 78 S.W.3d at 834. We conclude that the record supports the trial court's conclusion that Defendant failed to establish a connection between the witnesses' proposed testimony and the fact in issue and that Defendant failed to show that the proposed testimony would substantially assist the trier of fact. The trial court did not abuse its discretion by excluding the testimony.

Defendant also contends, and the State concedes, that the trial court erred when it sustained a hearsay objection by the State during defense counsel's attempt to qualify Defendant as an expert witness. During Defendant's offer of proof, defense counsel inquired into the basis of Defendant's knowledge of Freon and the effect it might have on the body. The trial court sustained an objection by the State,

> [Defense counsel]: Okay. Have you been warned at work about handling Freon?

6

[Defendant]: Yes, I have repeatedly. It can be hazardous. . .

[Prosecutor]: Objection, lack of foundation, hearsay.

THE COURT: Both are sustained.

[Defense counsel]: Are you . . .

THE COURT: Let me say this.

[Defense counsel]: Yes, sir.

THE COURT: Hearsay is sustained, therefore you don't get to even lack of foundation because you were trying to base your foundation, in part, on hearsay testimony.

[Defense counsel]: Thank you, sir.

THE COURT: Yes, sir.

Although the rules of evidence permit expert witnesses to rely upon reliable hearsay in forming their opinions, *see* Tenn. R. Evid. 703, the facts must be reasonably relied upon by experts in the particular field, and the facts must be trustworthy. *Id*., Advisory Comm'n Cmts. The Advisory Commission Comments to Tennessee Rule of Evidence 703 provide that "[i]f the bases of expert testimony are not independently admissible, the trial judge should either prohibit the jury from hearing the foundation testimony or should deliver a cautionary instruction." Because Defendant's testimony was given in an offer of proof, and outside the presence of the jury, no limiting jury instruction was necessary. Although it was error for the trial court to sustain the State's hearsay objection, we do not agree with Defendant's assertion that the trial court "abdicated . . . its function as the gatekeeper of expert testimony." Following the State's objection, the trial court allowed defense counsel to resume Defendant's offer of proof of his proposed expert testimony, and Defendant explained his knowledge of the effects of exposure to Freon. We have already reviewed the trial court's ruling on the admissibility of Defendant's expert opinion and determined that the record supports the trial court's conclusions.

Defendant also contends that the trial court erred by concluding that Defendant violated the rules of discovery regarding Mr. Adams' testimony. The State responds that the trial court did not abuse its discretion in ruling that Defendant's failure to disclose

7

proposed expert testimony was a discovery violation and that the State was prejudiced by Defendant's alleged discovery violation.

Tennessee Rule of Criminal Procedure 16(b) requires reciprocal disclosure of the results of any scientific tests or of reports prepared by an expert that are intended to be introduced in a defendant's case-in-chief. Defendant argues that because no testing was conducted and "the record is silent" as to whether any reports were prepared, Defendant was not required to disclose to the State that he intended to call Mr. Adams as a witness. Although we agree with Defendant that his failure to disclose that he intended to call Mr. Adams as an expert witness did not constitute a discovery violation under the rules of procedure, that was only one of the bases upon which the trial court excluded the testimony. As we stated above, the trial court also concluded that the testimony was not relevant and did not substantially assist the trier of fact. Because we hold that the trial court's ruling was correct in that regard, the trial court's error regarding a discovery violation is therefore moot.

Finally, Defendant contends that the trial court's ruling deprived him of his right to due process and prevented him from presenting a defense. Both "[t]he Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000). However, this right to present witnesses is not absolute. *Id*. Instead, "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). In order to determine whether the exclusion of evidence violated a defendant's right to present a defense, courts must consider: "(1) [w]hether the excluded evidence is critical to the defense; (2) [w]hether the evidence bears sufficient indicia of reliability; and (3) [w]hether the interest supporting the exclusion of evidence is substantially important." *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Brown*, 29 S.W.3d at 434-35).

In this case, reviewing the trial court's decision against the criteria set forth in *Flood*, we find that the testimony of Defendant and his co-worker regarding the presence of Freon in Defendant's blood and its effect on Defendant's blood alcohol test does not bear a "sufficient indicia of reliability" because, as we stated above, Defendant offered no evidence or data to support his theory, he provided no information that his theory is recognized by the scientific community, and he provided no evidence that Freon was, in fact, present in his blood sample.

8

Moreover, we cannot conclude that the proffered testimony was "critical to the defense." Defendant asserts, "[w]ithout the testimony related to Freon, [Defendant] was left without any explanation as to why his blood alcohol content was over the legal limit." However, Defendant's offers of proof presented no such explanation. Agent Hagar testified that an ineffective blood preservative might have produced a test result with a lower alcohol content, not greater. Thus, Defendant's argument suggests that if he and Mr. Adams had been allowed to testify regarding the presence of Freon in Defendant's blood, the jury could have concluded that his blood alcohol content was actually *higher* than the .18 percent reflected in Agent Hagar's testing.

We conclude that the trial court's decision did not violate Defendant's right to present a defense. Defendant is not entitled to relief.

For the reasons stated herein, we affirm the judgment of the trial court.


_____
THOMAS T. WOODALL, PRESIDING JUDGE